Summa v. Hofstra University

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: June 21, 2012                                    Decided: February 21, 2013)

Docket No. 11-1743

_____

LAUREN E. SUMMA,

*Plaintiff-Appellant*,

v.

HOFSTRA UNIVERSITY, DAVID COHEN, and
MELISSA CONNOLLY,

*Defendants-Appellees*.

_____

Before: POOLER, RAGGI, and LYNCH, *Circuit Judges*.

Lauren E. Summa appeals from a memorandum, order, and judgment of the United States

District Court for the Eastern District of New York (William D. Wall, *M.J.*) granting summary

judgment in favor of defendants Hofstra University, David Cohen, and Melissa Connolly, and

dismissing in its entirety Summa's suit claiming sexual harassment and retaliation in violation of

Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and

corresponding provisions of the New York State Human Rights Law. We hold that Summa

presented evidence sufficient to survive summary judgment with respect to her retaliation claims

but not her harassment claims.

Judgment affirmed in part, vacated in part, and remanded.

SHAFFIN A. DATOO, Thompson Wigdor LLP (Douglas H. Wigdor, *on the brief*), New York, NY, *for Plaintiff-Appellant*.

DOMENIQUE CAMACHO MORAN, Farrell Fritz, P.C. (Michael A.H. Schoenberg, *on the brief*), Uniondale, NY, *for Defendants-Appellees*.

POOLER, *Circuit Judge*:

Lauren E. Summa appeals from a memorandum, order, and judgment of the United States District Court for the Eastern District of New York (Wall, *M.J.*) granting summary judgment in favor of defendants Hofstra University ("Hofstra" or "the University"), David Cohen, and Melissa Connolly, and dismissing in its entirety Summa's suit claiming sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-88, and corresponding provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290-301. We hold that Summa has presented sufficient evidence to withstand a grant of summary judgment with respect to her retaliation claims, but not as to her sexual harassment claims.

**BACKGROUND**

**I.**

Lauren E. Summa was a graduate student at Hofstra University from 2006 through 2009. Prior to the start of her graduate program, Summa interviewed with Assistant Football Coach John Perry and was hired as a team manager. Summa asserts she was hired for both the fall and spring football seasons and an email from the football office, identifying Summa by name, indicated that team managers would be paid $700 for the fall season and $300 for the spring

2

season. Summa served as a team manager during the fall 2006 season. Her job responsibilities included assisting the football coaches before, during, and after practices, during August double sessions, and on game day throughout the season. She would also travel with the team to away games on the team bus. Summa's boyfriend, Phillip Hall, was a member of the football team.

Almost as soon as Summa began her term as manager, the players began to act in a way that made Summa feel uncomfortable. Throughout August and into the fall season, players made comments regarding her boyfriend, including that she should engage in sexual relations with him on the bus and that she should sit with another player if she wanted to be with a "real man," asserted that women should not be managers because they don't know anything about sports, and made remarks relating to Summa's use of the bathroom on the team bus. Comments of this sort appear to have pervaded Summa's tenure as team manager.

Around September 18, 2006, Summa learned that some players had created a Facebook page insulting both her and her boyfriend. The page contained a fake "Wanted" poster of Summa and a "Missing Persons" photo of her boyfriend, the "joke" apparently being that Summa kidnapped her boyfriend. The "Wanted" poster included, among other things, aliases for Summa listed as "Miss Piggie, The 'Wannabe' Big Boss Man, F.B. Manager." The poster, thus, expressly referred to Summa's employment as team manager. The photo of her boyfriend included a caption stating that "at the time of his disappearance, weight may have fluctuated because of . . . excessive sexual activities." The postings upset Summa, and she complained to defendant Head Football Coach David Cohen on or about September 24, 2006. Soon after this complaint, Cohen spoke with the involved players about their role in the page and ordered them to take the postings down. The players complied and the page was removed.

3

On November 18, 2006, the last day of the fall season, on the bus ride home from an away game, Assistant Coach Perry put on the video *Shadowboxer*, an R-rated film described as having numerous sex scenes. The players on the bus yelled whenever a sex scene aired and made a variety of lewd comments. During one particular scene in the movie when a female Caucasian character began masturbating in the presence of a male African-American character, Eric Taylor, a player on the team, turned towards Summa and stated, "This is what you white women want, our black dicks. That shit will make you crazy." Humiliated, embarrassed, and upset, Summa began crying, went to the front of the bus, and asked Perry to turn off the movie. Perry complied. After the coaches turned off the movie, the players yelled for Perry to turn it back on, chanting "we want boobies." Taylor told Summa to "sit down and like shut the fuck up" as she returned to her seat. Perry told the team to quiet down and stayed near Summa for the rest of the bus ride.

When the bus arrived back at school, Summa immediately found Cohen and reported what had happened. Summa told Cohen that she was tempted to report the incident to the University's Public Safety Department. Cohen urged Summa not to go to Public Safety because the incident would draw attention to the football program and told her that he would handle the incident. That day, Summa went to Public Safety and reported what had happened on the bus. She later spoke about her experience of harassment while student manager with the Dean of Students, who referred her to the University's Equality Officer, Dr. Maureen Murphy.

The following day, Cohen spoke with Taylor and a handful of other players. By that evening, Cohen decided to eject Taylor from the football team. The incident on the bus with Summa had been the "final straw" that, in addition to two other incidents, resulted in Taylor's

4

dismissal from the team. Cohen alerted his supervisors and reported his findings on the matter and contacted Summa to let her know that Taylor would no longer be on the team. Later that week, Summa met with Murphy and relayed to her the incidents of harassment Summa had suffered throughout the football season, including what had happened on the November 18 bus ride. Murphy told Summa that she had to file a written report. Summa complied, but the report only discussed the November 18 incident and not the other activity that Summa had complained of orally to Murphy. Murphy only investigated the incident on the bus because it was the only one contained within the written complaint.

Approximately a month after the incident, Murphy sent a memorandum of her findings to the University's Vice President for Legal Affairs. The report indicated that the incident "offers an opportunity for educating the coaching staff and all of the Athletics staff about the University's Harassment Policy" and stated that Murphy would like to schedule such a training "this spring." The training was provided in August 2007.

Based on the discussions with the coaching staff during her hiring and throughout the fall and the email from the football office indicating the stipend amount for both the fall and spring, Summa understood that she would also serve as team manager for the spring 2007 football season, known as "Spring Ball," which was slated to begin in the end of March. Meanwhile, Anthony Battaglia, the Equipment Manager hired in the fall of 2006, conducted a search for students interested in being the football team manager for the spring. A few days prior to the start of Spring Ball in March 2007, Summa called the football office to obtain the schedule. She learned via return voicemail from Cohen that the position had been filled because they had not yet heard from her. Cohen later indicated that he was not certain the position had been filled at the time he left Summa the voicemail. Summa did not serve as team manager during the spring.

5

In April 2007, in search of new employment, Summa applied for a graduate assistantship position in the Office of University Relations, helmed by Vice President for University Relations, defendant Melissa Connolly. Summa went through two interviews and, in mid-May 2007, was offered the position by Helen Stefanidis, Director of Marketing, Planning, and Operations for the office. Summa accepted. During this time, Summa was preparing a complaint against the University alleging that her replacement as team manager amounted to unlawful retaliation for her harassment complaints. She filed the complaint on May 9, 2007, with the New York State Division of Human Rights ("NYSDHR"). Evelyn Miller-Suber, Director of Human Resources, became aware of the complaint, and the University responded on May 17, 2007, attaching an affidavit, dated May 15, 2007, signed by Miller-Suber, regarding Summa's employment activities.

In June 2007, after Hofstra had become aware of Summa's NYSDHR complaint, Miller-Suber contacted Connolly to inform her that Vice Presidents were required to "sign off" on the paperwork for the graduate assistantship position for which Summa had been hired and that Connolly had neglected to sign the appropriate forms. Even though there was no requirement for doing so, Miller-Suber told Connolly that "it was probably best practice for [her] to interview anybody who would be working for [her] office," and encouraged her to interview the graduate assistants. Miller-Suber told Connolly that when interviewing, Connolly "should be sure that all of the candidates working in [Connolly's] office, whether they be full-time employees or graduate assistantships, should be able to represent the University in meetings, represent the University . . . with external audiences, and be advocates for the University." Connolly took Miller-Suber's instruction to include inquiring about litigation-related conflicts. In July 2007,

Stefanidis contacted Summa to arrange for Summa to "meet" with Connolly. The email did not describe the meeting as an interview or say that the purpose was for Connolly to determine whether Summa's hiring would ultimately be approved.

Connolly and Summa met on July 19, 2007. Connolly felt that Summa's resume was imprecise. On her resume, instead of listing only her official degree program titles for her undergraduate and graduate programs of study, Summa listed both the degree program or major and a particular area of interest. Connolly testified that she had interpreted these listings to indicate double majors, though Summa clarified at the interview what she had meant. Summa had previously had her resume reviewed by the University's own career department on more than one occasion and had never been told there was a problem with her presentation of both her degree program and area of interest without explicit labels so identifying them. Connolly also testified that she felt Summa had overstated the importance of her duties at an internship without articulating how. Connolly later contacted one of Summa's references who reportedly gave her a lukewarm recommendation. Connolly spoke with another candidate for the graduate assistantships on the phone and could not recall if she contacted that candidate's references. Shortly thereafter, Connolly consulted Miller-Suber about whether Summa's imprecision on her resume was a sufficient reason not to approve her for the position. Miller-Suber responded that such precision was very important and that if Connolly agreed as to the importance, they should not hire Summa. Connolly subsequently rescinded Summa's offer of employment.

On January 25, 2008, Summa filed the instant lawsuit. She continued to work at Hofstra until the summer of 2008, at which point Miller-Suber terminated Summa's privilege of student employment by letter because the University discovered she had double-counted some of her

7

hours, claiming to be working at two jobs simultaneously. According to Miller-Suber, Hofstra's legal department had notified her of the duplicative hours. Miller-Suber then compared the time sheets for two of Summa's jobs for one pay period in July 2006 and saw duplicate billing of hours. According to the student handbook, such double-billing was prohibited and could result in the loss of working privileges, so Miller-Suber revoked Summa's ability to work on campus. Miller-Suber had never terminated any other student's privilege of student employment in the past nor had she investigated any other student's billing practices. According to Summa, she input her hours this way because her supervisor had explicitly advised her to do so because, when working multiple jobs, the hours worked needed to be input as worked during regular business hours. Summa would list work done outside of typical business hours as done during the business day, while she was at another job, in order to receive compensation for hours actually worked.

## II.

After Summa filed the instant action, Defendants moved for and were granted summary judgment on all counts. The district court concluded that no reasonable jury could find that Summa had experienced a hostile work environment and, further, that even if Summa had established a hostile work environment, no liability could be imputed to defendants because they had swiftly and appropriately handled her complaints. As to Summa's Title IX harassment complaint, the district court concluded that no employment-related private right of action was available under Title IX and that Summa had not demonstrated harassment in her capacity as a student. The court dismissed Summa's three retaliation claims, concluding that she had failed to meet the criteria outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Summa now appeals.

8

## DISCUSSION

"We review the district court's grant of summary judgment *de novo*, applying the same standards that govern the district court's consideration of the motion." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010). "Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001). We resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).

## I.

Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006). "In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted). Here, we need not and do not determine whether Summa's showing of harassment was sufficiently severe or pervasive to constitute a hostile work environment under Title VII or the NYSHRL because we hold that the conduct in this case cannot be imputed to Hofstra.

9

## II.

Assuming that Summa's allegations constituted a hostile work environment, there are no grounds upon which the objectionable conduct can be imputed to the University. In this case, all of the alleged harassers were players on the football team. While this Circuit has not yet determined the standards for addressing harassment attributable to non-employees, we now adopt the well-reasoned rules of the Equal Employment Opportunity Commission ("EEOC") in imputing employer liability for harassment by non-employees according to the same standards for non-supervisory co-workers, with the qualification that we "will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." 29 C.F.R. § 1604.11(e).

By analogy to the rules for non-supervisory co-workers, *see id.* § 1604.11(d), "the employer will be held liable only for its own negligence," and the plaintiff must demonstrate that the employer "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 762 (internal quotation marks omitted). In determining the appropriateness of an employer's response, we look to whether the response was "immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility [the employer] has with respect to [the employee's] behavior." *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997).

In this case, we think it apparent that the University and the head football coach had a high degree of control over the behavior of its student football players, and thus apply the test for imputing harassment by co-workers. Once Hofstra knew or should have known about the

10

harassing behavior, it had a remedial obligation to address and end the harassment. We find that Hofstra met its obligation.

The first time Summa complained to Cohen about the behavior of the football players was in late September 2006, regarding the objectionable Facebook postings. It is undisputed that Cohen promptly spoke to the three players involved in making the offending postings and instructed the players to remove the posts. The players complied, and no further online postings or other public displays were directed at Summa. Summa next complained to Cohen about the incidents surrounding the movie viewing on the team bus on November 18, 2006. Again, it is undisputed that as soon as Summa complained to Assistant Coach Perry about the content of the movie, he turned it off. Upon the players' raucous reaction, Perry immediately instructed them to be quiet and stationed himself near Summa for the rest of the bus ride. Upon arriving back at the University, Summa relayed her complaint to Cohen, who, within 48 hours, investigated the incident, immediately talking with the coaching personnel who had been on that bus, and removed Taylor from the football team. The fact that this incident was one of "three strikes" that lead to Taylor's expulsion does not undermine the appropriateness of Cohen's actions. The standard for reviewing the appropriateness of an employer's response to co-worker harassment "is essentially a negligence one, and reasonableness depends among other things on the gravity of the harassment alleged." *Torres v. Pisano*, 116 F.3d 625, 638 (2d Cir. 1997) (citation and alteration omitted). Each complaint that was brought directly to Cohen's attention was dealt with quickly and in proportion to the level of seriousness of the event. The fact that Cohen took action at once—completed within just days in all cases—speaks to the appropriateness of the University's response in this case. Because defendants took the needed remedial action in this

11

case, the harassment carried out by some players on the football team cannot be imputed to the University and its personnel. In addition to the prompt response to the particular incidents of harassment, upon the report of the movie incident to the school's EEO officer—which took place after the offending player had already been expelled from the football team—the University had the entire Athletics staff undergo sexual harassment training before the start of the next football season. In addition to directly addressing the particular incidents of harassment of which it was aware, the University also took proactive steps to create a better environment for all employees in the future. Thus, district court properly granted summary judgment in favor of Hofstra and Cohen with respect to Summa's harassment claims.

### III.

The burden-shifting framework laid out in *McDonnell Douglas*, 411 U.S. at 802, governs retaliation claims under both Title VII and the NYSHRL. *Schiano*, 445 F.3d at 609. To make out a prima facie case of retaliation, a plaintiff must make four showings: that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* at 608. "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). If the employer demonstrates a legitimate, non-discriminatory reason, then "[t]he burden shifts . . . back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* at 625.

12

## A.

There is no dispute that Summa satisfied the second and third elements of the prima facie case contemplated by *McDonnell Douglas*—employer knowledge and adverse employment actions. It is apparent that a number of Hofstra officials—including Cohen, Equality Officer Maureen Murphy, and Linda O'Malley of the Office of the Dean of Students—were aware of Summa's complaints throughout 2006 and 2007. And, at a minimum, the University's legal office knew about the instant litigation. Nothing "more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity," *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000), and it is apparent Hofstra had such knowledge here. As to the third factor, Hofstra concedes that each of Summa's asserted claims—namely, (1) the denial of the football manager position for 2007 Spring Ball; (2) the denial of the graduate assistantship position in the Office of University Relations; and (3) the termination of Summa's privilege of student employment—constitutes an adverse employment action.

The district court nonetheless determined that Summa could not prevail on any of her three retaliation claims based on her supposed failure to demonstrate that she had engaged in protected activity and the requisite causation. We conclude that the district court erred in its analysis of these *McDonnell Douglas* factors and that Summa has made a sufficient showing on each of these factors in order to establish a prima facie case.

## 1.

To establish that she engaged in protected activity, Summa "need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that

13

statute." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (internal quotation marks omitted). The district court erred in concluding that Summa could not have reasonably believed that her complaints to public safety and the school's Equality Officer were complaints about violations of Title VII. That the school considered these complaints to be "student-on-student" issues is of no moment, as the first element of the prima facie case explicitly contemplates the belief of the plaintiff, not of the employer. At the same time, Equality Officer Murphy also concluded that the comment by Taylor constituted sexual harassment and that the showing of the movie raised concerns that needed to be investigated. Upon investigation, Murphy concluded that the Athletics Department staff would benefit from a sexual harassment training, which was carried out the following August. In addition, regardless of the steps taken, the University's definition of the incident as a "student-on-student" issue has no bearing on the reasonableness of Summa's belief that it was employment related and actionable under Title VII. It is clear from Summa's formal EEO complaint that she believed that the event was employment related. Furthermore, this was an entirely reasonable belief because Summa was not on the football team bus in her capacity as a graduate student, but rather was there solely in her capacity as an employee of the Athletics Department.

As to the assertion that no reasonable person could believe a single incident amounted to a Title VII violation, we disagree. Our case law, particularly *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000), establishes that a single incident can create a hostile environment if it is sufficiently severe. The incident on the team bus was close enough in severity to that in *Howley* that a reasonable person certainly could have believed that it alone was enough to satisfy the standard. Finally, as Summa correctly notes, the district court erroneously confined its

14

consideration to her written complaints. The written notes of the University's Equality Officer evidence that Summa complained about the entire course of harassment over the semester. In determining the reasonableness of Summa's belief, the court should have considered these complaints as well because "[t]he law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000) (internal quotation marks omitted). Furthermore, Summa's belief that her May 2007 complaint to the New York State Division of Human Rights constituted protected activity is evident not only for all of the same reasons that apply to her internal complaint, but also based upon the conclusion of the NYSDHR itself, which determined that there was probable cause to proceed on Summa's complaint. We conclude it was objectively reasonable for Summa to believe she had suffered from employment discrimination under Title VII and that her complaints to her employer were directed at just this harm. We conclude that, with respect to all of her retaliation claims, Summa has met the first step in making a prima facie case of retaliation by demonstrating that she had engaged in protected activity.

## 2.

The district court also erred in concluding that there was insufficient evidence of causation to meet the fourth element of a prima facie case of retaliation under Title VII with respect to Summa's loss of the football manager position and the termination of all of Summa's employment privileges. The district court concluded that Summa could not establish that her

15

November 2006 complaints caused her replacement as football manager because there was no evidence that the *decisionmaker* responsible for hiring spring managers, Equipment Manager Battaglia, either knew about Summa's complaints or knew that Summa had wanted to return as a manager. To the extent that decisionmaker knowledge is relevant in establishing causation, that knowledge may be satisfied by demonstrating that "the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity *acts pursuant to encouragement by a superior* (who has knowledge) to disfavor the plaintiff." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) (emphasis added). While there is no direct evidence that Cohen specifically told Battaglia not to hire Summa, crediting Summa, as we must, Cohen and Perry told her the position continued into the spring and the email regarding the position clearly identified both the fall and spring seasons. A reasonable jury could conclude that these facts, coupled with the fact that these coaches then either allowed Battaglia to replace her or told Battaglia that new managers were needed, constitute Battaglia's superiors encouraging him to disfavor Summa. Battaglia's affidavit states only that at the time he selected students to serve as managers, he was not aware that Summa had any interest in returning. The affidavit does not say who told him to hire managers, and a jury could reasonably infer that it was Cohen who told Battaglia that they needed to hire new managers. This conclusion is further supported by Perry's deposition testimony that he had hired student managers in the past because Cohen told him it needed to be done. A jury could reasonably conclude that the same procedure characterized manager hiring in the spring.

Furthermore, Summa's presentation of a temporal connection is enough, in and of itself, in this instance to permit a reasonable jury to find causation. We have regularly held that "[t]he

causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted). Furthermore, "[w]e have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action. This has allowed our Court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (internal quotation marks and citation omitted) (comparing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity) with *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection)).

In *Espinal*, we concluded that "the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in the prior lawsuit, [wa]s sufficient to support an inference of a causal connection." *Id.* We explained that "[i]t is plausible that the officers waited to exact their retaliation at an opportune time—as when Espinal was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered by Espinal." *Id.* The temporal relationship here is much like that in *Espinal*. Only four months passed between Summa's November 2006 complaints and the denial of the spring season manager position. There is strong reason to find

17

this four-month time span sufficient in this case to establish causation because Summa's complaints were based on events that occurred on the very last day of the fall season. The start of the spring season was the first moment in time when the football coaching staff could have retaliated against Summa as she was not directly working for them over the intervening months. This Court has recently held that even gaps of four months can support a finding of causation. *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009) (summary order). Here, this close temporal relationship is made even closer by the fact that the adverse action occurred at the first actual opportunity to retaliate. Thus, with respect to the denial of the football manager position, Summa has made a prima facie case sufficient to move on to the next step of the *McDonnell Douglas* analysis.

Likewise, the combination of reasonably close temporal proximity and the particular context in this case is sufficient to infer causation in establishing a prima facie case of retaliation regarding the termination of Summa's employment privileges at Hofstra. *See Espinal*, 558 F.3d at 129-30. The seven-month gap between Summa's filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote. *See Grant*, 622 F.2d at 45-46 (finding causation based on an eight-month lag between protected activity and adverse action). In addition to the fact that seven months is within the temporal range that we have found sufficient to raise an inference of causation, the other surrounding circumstances—including Miller-Suber's personal knowledge of the lawsuit when she decided to terminate the employment privileges and Miller-Suber's comment about insuring that graduate employees like Summa are able to "be advocates for the University," which Connolly took as including litigation-related conflicts—are sufficient to allow an inference of causation here.

18

As correctly noted by the district court, Summa's May 2007 complaint to the NYSDHR and its June 2007 determination that she had established probable cause are plainly close enough in time to the July 2007 rescission of the offered graduate assistantship that causality may be inferred. Thus, with respect to all three adverse actions, Summa has established a prima facie case sufficient to move on to the next step of the *McDonnell Douglas* analysis, namely, the burden shifting to the University to offer legitimate, nondiscriminatory reasons for the adverse actions in question.

**B.**

The next stage of the *McDonnell Douglas* balancing test places the burden on the University to demonstrate that there were legitimate, non-retaliatory reasons for each of the three adverse actions previously identified. *Raniola*, 243 F.3d at 625. The district court did not consider the reasons offered by the University for Summa's replacement as football manager or for the termination of her employment privileges, and the University has made no direct argument as to its legitimate motivations either here or in its motion for summary judgment below. We nonetheless consider the record as whole and glean legitimate, non-retaliatory reasons for each of these adverse actions. Because Summa did not contact the football team regarding Spring Ball until immediately prior to the season, a legitimate reason for her replacement was the football staff's conclusion that the position needed to be filled because they had not heard from her. With respect to the rescission of the graduate assistantship position, Connolly's conclusion that Summa had overstated her qualifications, misrepresented her academic majors, and received "a lackluster reference" all amount to legitimate, non-retaliatory reasons. Finally, the legitimate, non-retaliatory reason for the termination of Summa's

19

employment privileges was her double entry of hours on her time sheets for two student employment positions. Because legitimate non-retaliatory reasons can be offered for each of the adverse actions complained of, the burden shifts back to Summa "to establish, through either direct or circumstantial evidence, that the [University's] action was, in fact, motivated by discriminatory retaliation." *Id.*

## C.

While a Title VII plaintiff need not prove that retaliation was the only motivating factor for an adverse action, *see Gordon*, 232 F.3d at 117, the plaintiff must show that retaliation was the determinative factor, *see Matima*, 228 F.3d at 81. In this Circuit, it is "settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail." *Gordon*, 232 F.3d at 117. In assessing whether a plaintiff has established that an adverse employment action was motivated by discriminatory retaliation, "there are two distinct ways for a plaintiff to prevail—either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Id.* (internal quotation marks omitted).

With respect to the spring football manager position, Summa presented evidence that she had repeatedly discussed the spring season with the football coaching staff and, more tellingly, presented an e-mail that listed her stipend for the year as "Fall: $700 Spring: $300." Defendants now argue that they did not know she was returning for the spring because she did not contact the football office until immediately before the start of Spring Ball, but this claim is undermined by the documentary evidence regarding her spring salary. Furthermore, drawing all inferences in

20

Summa's favor as we must at this stage, a jury could also conclude that the fact that she waited until just before the spring season and contacted the department only for the purpose of obtaining the schedule corroborates her account that she had been told she had the position already lined up, thus obviating any need to contact the department at an earlier time. The evidence in the record also demonstrates that Cohen did not know whether the position was actually filled when he denied Summa the spring manager position, and Battaglia's e-mails concerning the hiring process for student managers suggest that indeed the position was not filled. This evidence would allow a reasonable jury to conclude that the position was, in fact, available and was denied to Summa in retaliation for her complaints regarding her treatment during the fall season. Thus, Summa has made a sufficient showing of pretext, undermining the reason proffered by the University for the removal of her position as manager of the football team for the spring.

Summa has also made a sufficient showing of pretext with respect to the rescission of the graduate assistantship position. The district court concluded that Summa's presentation of her area of interest in addition to her major without explicitly identifying it as such was a sufficient reason for the University not to hire her as a graduate assistant. However, the district court began its analysis too late in the sequence of events: it failed to consider the evidence that (a) Summa had already been offered the position; (b) Miller-Suber, who was well aware of Summa's NYSDHR complaint, both suggested and encouraged Connolly to re-interview Summa when Connolly could simply have signed off on the form based on her staff's evaluation of Summa; and (c) Miller-Suber encouraged and affirmed Connolly's decision to rescind her offer. Moreover, the e-mail informing Summa of the Connolly interview falsely stated that the office had never hired a graduate assistant before *and* misrepresented the nature of her meeting with

21

Connolly, stating simply that Summa should "meet" Connolly. The e-mail did not say that Summa's offer, which a jury could find she had already accepted, was in danger of being rescinded if the interview did not go well. Moreover, a jury is not required to credit Connolly's testimony that she was unaware of the NYSDHR complaint. Connolly admitted to speaking with Miller-Suber, who knew of the complaint, and Summa described Connolly's attitude toward her as cold. The fact that Connolly took detailed notes and prepared a memo explaining her hiring decision, which by her own admission was not her regular practice, further supports an inference that she knew of Summa's complaint and felt the need to carefully document her decision in case any questions should arise in the future.

Furthermore, evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in the Title VII context are pretextual. *Raniola*, 243 F.3d at 625. Here, the undisputed evidence indicates that Summa was the only potential graduate assistant who had an in-person interview with Connolly, and she was the only one whose references were contacted. Further, on this record, drawing all inferences in favor of Summa, Miller-Suber involved herself in the hiring process with respect to Summa to a far more substantial degree than she did with the other graduate assistant, including encouraging Connolly to rescind the offer. The difference in treatment between Summa and the other graduate assistant is thus evidence from which a reasonable jury could conclude that the reason proffered by the University was a pretext for a retaliatory motivation.

Finally, with respect to the third adverse employment action—the termination of Summa's student employment privileges—we also hold that Summa has presented sufficient evidence to conclude that the reason advanced by Miller-Suber and the University was

22

pretextual. While it is undisputed that Summa double-booked hours on at least one time sheet, Miller-Suber admits that she had never even looked into the billing practices of any other student employee and had never previously terminated student employment privileges for the practice. Miller-Suber also admitted that she had once terminated a manager for allowing such double-billing to occur. Thus, as Miller-Suber knew that a manager had permitted student employees to double-bill, she must, of course, also have known that one or more of the *students* working for that manager had double-billed. Yet in that situation, it was only the manager, and not the students, who was investigated and punished. This starkly different treatment of students who had committed the same wrong as Summa would allow a reasonable jury to conclude that Miller-Suber's cited reason for the termination was indeed pretext for a retaliatory motive. Therefore, with respect to each of the three adverse employment actions alleged in the instant case, Summa has made a sufficient evidentiary showing to survive summary judgment.

## IV.

Title VII and Title IX are governed by the same substantive standards for reviewing claims of both harassment and retaliation. *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995). Title VII provides an administrative procedure by which an individual claiming harassment or retaliation must first pursue administrative remedies before the EEOC prior to seeking judicial relief, *see* 42 U.S.C. § 2000e-5, while Title IX does not. In the instant case, Summa complied with the administrative procedures under Title VII and brings the same claims under both Title VII and Title IX. This is not a case where the plaintiff's access to relief is prohibited because of her failure to comply with the administrative scheme of Title VII or the plaintiff only brought suit under Title IX. Nor is Summa claiming any relief that is particular to

23

Title IX.  Thus, we need not and do not address the barely briefed issue of whether there is a private right of action for employment discrimination under Title IX.[1]  All of the relief sought by Summa is cognizable under her Title VII claim, which, in this particular instance, her Title IX claim simply duplicates.

## CONCLUSION

For the reasons stated above, the judgment of the district court hereby is AFFIRMED in part and VACATED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

---

[1] We note that the First and Fourth Circuits have recognized such a right of action, *see Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 205-06 (4th Cir. 1994) ("An implied private right of action exists for enforcement of Title IX.  This implied right extends to employment discrimination on the basis of gender by educational institutions receiving federal funds." (citation omitted)); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir. 1988) (finding employment discrimination against a student-employee actionable under Title IX), while the Fifth Circuit has held there is no such right, *see Lakoski v. James*, 66 F.3d 751, 755 (5th Cir. 1995).  We also note that the U.S. Department of Justice recognizes such a cause of action.  U.S. DEP'T OF JUSTICE, TITLE IX LEGAL MANUAL IV.B.2., *available at* http://www.justice.gov/crt/about /cor/coord/ixlegal.php ("The Department takes the position that Title IX and Title VII are separate enforcement mechanisms.  Individuals can use both statutes to attack the same violations.  This view is consistent with the Supreme Court's decisions on Title IX's coverage of employment discrimination, as well as the different constitutional bases for Title IX and Title VII." (citing *Henschke v. N.Y. Hosp.-Cornell Med. Ctr.*, 821 F. Supp. 166, 172-73 (S.D.N.Y. 1993)).