18-1602-cv
*Jones v. Cty. of Suffolk*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018
No. 18-1602-cv

JOHN JONES,
*Plaintiff-Appellant*,

*v.*

COUNTY OF SUFFOLK and PARENTS FOR MEGAN'S LAW,
*Defendants-Appellees.*[1]

Appeal from the United States District Court
for the Eastern District of New York.
No. 15-cv-111 — Joanna Seybert, *Judge*.

ARGUED: JUNE 19, 2019
DECIDED: SEPTEMBER 4, 2019

Before:  CABRANES, RAGGI, and DRONEY, *Circuit Judges*.

---

[1] The Clerk of the Court is directed to amend the official caption as shown above.

The County of Suffolk contracted with the private nonprofit organization, Parents for Megan's Law ("PFML"), to conduct home visits to verify the addresses of individuals who are registered as sex offenders on the New York State Sex Offender Registry. John Jones, a registered sex offender, was visited by the organization twice. He brought this action under 42 U.S.C. § 1983, alleging that the visits constituted unreasonable seizures in violation of the Fourth Amendment. He appeals from the final judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*) granting summary judgment in favor of the defendants. The district court held that, even assuming Jones was "seized" within the meaning of the Fourth Amendment, the visits were constitutional under the "special needs" doctrine. We **AFFIRM**.

---

ERIN BETH HARRIST New York Civil Liberties Union, New York, NY, (Aadhithi Padmanabhan, Christopher Dunn, New York Civil Liberties Union, New York, NY; Lawrence Spirn, Northport, NY, *on the brief*), *for Plaintiff-Appellant.*

DANA KOBOS, Assistant County Attorney, *for* Dennis M. Brown, Suffolk County Attorney, Hauppauge, NY, *for Defendant-Appellee County of Suffolk.*

MAURIZIO SAVOIARDO, III (Michael A. Miranda, *on the brief*), Miranda Sambursky Slone Sklarin Verveniotis LLP, Mineola, NY, *for Defendant-Appellee Parents for Megan's Law.*

2

DRONEY, *Circuit Judge*:

Plaintiff-Appellant John Jones brought this 42 U.S.C § 1983 claim alleging that the Defendants-Appellees, the County of Suffolk (the "County") and the private nonprofit organization Parents for Megan's Law ("PFML"), violated his Fourth Amendment rights while acting under a local law and contract authorizing PFML to visit the homes of individuals registered on the New York State Sex Offender Registry in Suffolk County, New York, and verify their addresses. On summary judgment, the United States District Court for the Eastern District of New York (Seybert, *J.*) assumed that the verification visits to Jones's home constituted seizures and found that PFML was a state actor for purposes of Fourth Amendment analysis.

The district court determined that, nonetheless, the verification visits were "reasonable" under the Fourth Amendment because their primary purpose was to serve the "special need" of "verify[ing] the addresses of registered sex offenders in order to improve the accuracy of the sex offender

registry." *Jones v. Cty. of Suffolk*, 15-cv-111, 2018 WL 2023477, at *18 (E.D.N.Y. May 1, 2018). The court granted summary judgment in favor of the defendants. Jones now appeals that decision, arguing that the special needs doctrine does not apply because the visits constituted a law enforcement effort to seek evidence that previously convicted sex offenders committed the crime of violating New York state's registration requirements.

We assume without deciding that the visits were the product of state action and constituted seizures under the Fourth Amendment, but hold that they were reasonable under the special needs doctrine. We therefore AFFIRM.

## I.      BACKGROUND[2]

### A.      SORA and the Suffolk County Verification Program

In July 1995, New York state enacted its version of a "Megan's Law,"[3]

---

[2] In reviewing the district court's grant of summary judgment, we rely on the undisputed facts in the record, drawing reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

[3] "Megan's Laws" are named after Megan Kanka who "was the seven-year-old victim of

the New York State Sex Offender Registration Act ("SORA"), requiring individuals convicted of certain offenses to register as sex offenders in a state registry maintained by the state Division of Criminal Justice Services. *See* 1995 N.Y. Laws 2870 (codified at N.Y. CORRECT. L. §§ 168–168-w)). "SORA aims both to protect members of the public, especially vulnerable populations, from sex offenders by notifying them of the presence of sex offenders in their communities and to enhance law enforcement authorities' ability to investigate and prosecute sex offenses." *Doe v. Pataki*, 481 F.3d 69, 70 (2d Cir. 2007).

Under SORA, each registrant must periodically mail in a completed form to verify home-address information and report to a police station to have a photograph taken for the registry. N.Y. CORRECT. L. § 168-f. Failure to provide accurate or timely information is a felony offense. *Id.* § 168-t.

Other requirements under SORA depend in part on the registrants'

---

a sexual assault and murder in New Jersey in 1994" and whose death "sparked enactment of sex offender registration and notification statutes in that state and several others." *Doe v. Pataki*, 120 F.3d 1263, 1265 n.1 (2d Cir. 1997), *as amended on denial of reh'g* (Sept. 25, 1997).

risk of recidivism. An administrative board of examiners assesses that risk and assigns registrants a score of Level One, Two, or Three, with Level-One offenders having the lowest risk of recidivism and Level-Three offenders having the highest risk. *Id*. § 168-l. For Level-Two and -Three offenders, personal identifying information including registrants' names, photographs, home addresses, and employer addresses, as well as information concerning their crimes of conviction and sentences, is publicly available through a state-operated online database. *Id.* § 168-q. The registration statuses and zip codes of Level-One offenders are publicly available through a toll-free telephone hotline maintained by the state, but that information is not available online. *Id.* § 168-p.

In January 2013, due to concerns about the accuracy of the Registry, PFML and the Suffolk County Police Department ("SCPD") created and presented a proposal for an in-person address verification program to the Public Safety Committee of the Suffolk County Legislature. The following month, the Legislature adopted the "Community Protection Act,"

authorizing SCPD to contract with PFML to verify the home addresses of sex offenders registered under SORA in Suffolk County, monitor registrants' use of social media, develop a system for reporting SORA violations, and provide community education concerning SORA.[4]

Pursuant to the Community Protection Act, in April 2013, the County, acting through SCPD, entered into a three-year contract with PFML that, among other things, authorized PFML agents to visit registrants at home to verify their addresses. The contract required PFML to use retired law enforcement officers to conduct the verification visits, whom it calls "Registry Verification Field Representatives" or "RVRs." Any tips SCPD received from PFML that registrants failed to accurately register home-address information could be investigated by SCPD for possible criminal prosecution.

Shortly after the contract took effect, PFML began reporting to SCPD

---

[4] Prior to the adoption of the Community Protection Act, SCPD detectives periodically conducted home visits to verify SORA information.

that registrants were "not being receptive to . . . RVRs." App'x 1550. Based on those reports, the SCPD Chief of Police directed Detective Lieutenant Stephen Hernandez, who was then the head of the SCPD Special Victims Unit, to draft a letter to notify registrants of the PFML verification visits and to "encourage[] cooperation." App'x 1550. On July 22, 2013, Detective Lieutenant Hernandez sent a letter to all SORA registrants on SCPD letterhead stating that PFML will visit registrants' homes and request to see a photographic identification with current address information. It states that registrants are "required to provide" residential and employment address information under SORA. App'x 1767. According to Detective Lieutenant Hernandez, after the letter was sent, the issue with noncompliance "seem[ed] to have gone away." App'x 1544. At the end of the first year, PFML reported a 99% cooperation rate from registrants.

PFML conducted 2,640 home verification visits from May 1, 2013, through April 30, 2014, and found that approximately 13% of registered home addresses conflicted with information collected by RVRs. PFML

referred 173 "failures to register home address felony leads" to SCPD during that first year of the program. App'x 1624. While there is no information in the record concerning the number of arrests based on the tips transmitted that year, in the first three years of the program, SCPD arrested nineteen registrants for SORA violations based on PFML tips.

**B.** **Factual Background to this Case**

In 1992, Plaintiff-Appellant John Jones, proceeding here by pseudonym, was convicted of crimes for which he was incarcerated for four years. Jones was released in April 1996 and was required to register as a sex offender under SORA. He was initially classified as a Level-Two offender, but was reclassified in 2004 as a Level-One offender.

In August 2013, two RVRs rang the doorbell at the Joneses' home while Jones was showering. Mrs. Jones answered the door and permitted the men to wait for Jones, assuming they were police officers based on their

9

identification cards and apparel.[5]  Approximately fifteen minutes later, Jones met the RVRs who were waiting on the walkway leading to his steps, about five feet from the front door.  One of the RVRs asked to see Jones's driver's license, which he kept in his vehicle parked on the street, to verify his address.  The men walked to Jones's car, where he produced the driver's license.  The RVRs wrote down some information and told Jones that they "may see [him] at [his] job," then left.  App'x 204.

The following year, in July 2014, RVRs again visited Jones's home to verify his SORA information.  Jones again met the RVRs in front of his home and, upon request, Jones retrieved his license from his vehicle parked on the street.  The interaction lasted approximately two minutes.

During neither interaction did the RVRs threaten, touch, or treat Jones disrespectfully.  However, Jones contends that the interactions caused him public embarrassment and, as a result, he stopped going to his children's

---

[5] The contract between PFML and SCPD required RVRs to wear photographic identification badges that identified the bearers as PFML agents.  However, it prohibited RVRs from wearing badges that resembled law enforcement badges.

10

school and athletic activities, and does not "go out" as much as he used to.[6]

App'x 212.

On March 16, 2016, Jones was removed from the SORA registry after he completed his required twenty years of registration.[7]

**C.      Procedural Background**

On January 9, 2015, Jones filed the complaint in this action alleging, as relevant here, a claim for damages under 42 U.S.C. § 1983 against both PFML and the County, based on the alleged deprivation of his Fourth Amendment right to be free from unreasonable searches and seizures, and related state-law claims.[8]  The district court granted summary judgment in

---

[6] While Jones testified that the home verification visits caused his embarrassment and withdrawal from activities, he also gave arguably conflicting testimony that his distress was caused by an unrelated incident that occurred around the same time as the first visit, in which his daughter's school district sent a flyer to "[t]he whole town" containing Jones's photograph and sex-offender status.  App'x 196.

[7] Under SORA, Level-One offenders must fulfill registration requirements for a period of twenty years from the initial date of registration, while Level-Two and -Three offenders must register for life.  N.Y. CORRECT. L. § 168-h.

[8] Jones also alleged due process claims that were dismissed by the district court for failure to state a claim and are not at issue on appeal.  In addition to the damages he seeks here, he also sought prospective injunctive relief based on his Fourth Amendment claim, but clarified at oral argument before this Court that he is no longer pursuing that remedy.

favor of the defendants on the § 1983 Fourth Amendment claim, concluding that (1) PFML is a state actor for purposes of liability under 42 U.S.C. § 1983; (2) a triable issue of fact precluded summary judgment on the issue of whether Jones was "seized" within the meaning of the Fourth Amendment; but (3) assuming Jones was seized, the seizures were reasonable under the special needs doctrine. Having dismissed all of Jones's federal-law claims, the court declined to exercise supplemental jurisdiction over his remaining state-law claims and dismissed those claims without prejudice. Jones appealed the grant of summary judgment as to his § 1983 Fourth Amendment claim.

**II.    STANDARD OF REVIEW**

We review the district court's determination on summary judgment *de novo. Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). In doing so, we apply the same standard that the district court applied, affirming a grant of summary judgment only where "there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted)

Whether undisputed facts rise to the level of a constitutional violation is a question of law that we review *de novo*.  *See Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005) (citing *Ornelas v. United States*, 517 U.S. 690, 697–99 (1996)).

**III.    DISCUSSION**

To prevail on his claim under 42 U.S.C. § 1983, Jones must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).[9]  On appeal, Jones contends that the district court erred in finding that the verification visits to his home did not violate the Fourth Amendment because, in the district court's view, they constituted reasonable seizures under the special needs doctrine.[10]  PFML urges us to affirm on that issue or, in the alternative,

---

[9] A claim for civil liability under 42 U.S.C. § 1983 can be maintained against a local governmental entity only if it satisfies the requirements articulated by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Neither PFML nor the County has argued on appeal that it is not a proper party to this action, and we therefore do not address that issue.

[10] While the complaint alleged that defendants deprived Jones of his right to be free from unreasonable searches and seizures, on appeal he argues only that PFML's alleged seizures of him were unreasonable.

to determine that the district court erred in refusing to grant summary judgment on two threshold issues: that (1) PFML was not a state actor against whom a § 1983 claim may be brought; and (2) the RVRs did not "seize" Jones in conducting the two verification visits.[11] We need not address PFML's alternative arguments because we conclude that, even if the state action and seizure questions were to be decided in Jones's favor, the special needs doctrine warrants the district court's award of summary judgment to defendants.

To explain that conclusion, we begin with the Fourth Amendment, which "does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989). Generally, a seizure amounting to an arrest "is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Id*. Similarly, a stop, during which a person is seized only briefly, usually

---

[11] The County does not challenge those threshold conclusions by the district court on appeal.

14

for purposes of crime prevention and investigation, is not reasonable unless supported by facts affording a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *see Terry v. Ohio*, 392 U.S. 1, 21–25 (1968). Nonetheless, courts have allowed limited exceptions to these general seizure rules. Under one such exception, the special needs doctrine, courts have "recognize[d] as constitutionally reasonable . . . temporary seizures that serve 'special needs beyond the normal need for law enforcement,' where 'the warrant and probable-cause requirement are impracticable.'" *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (quoting *Skinner*, 489 U.S. at 619) (internal alteration omitted).

The special needs doctrine applies only in "exceptional circumstances." *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, *J.*, concurring); *see also Chandler v. Miller*, 520 U.S. 305, 309 (1997) (describing the special needs exception as "closely guarded").[12] To satisfy the special

---

[12] Many of the cases on which we rely to determine whether the alleged seizures of Jones served special needs arose in the search context; however, we find those cases applicable

15

needs test, the government must identify a substantial non-law enforcement interest justifying "a Fourth Amendment intrusion." *Chandler*, 520 U.S. at 314. If the government meets that burden, then we "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* at 306. Where the liberty interests implicated by the seizure are minimal, and "where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a [seizure] may be reasonable despite the absence of such suspicion." *Id.*

## A. Special Need

To qualify as a special need, the governmental interest in the objective must be "substantial"; that is, "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler*, 520 U.S. at 318. In determining whether a search or temporary seizure

---

in the challenged context of temporary seizures. *See, e.g.*, *Berg v. Kelly*, 897 F.3d at 106 (relying on cases from search context to determine whether temporary seizures of protestors served a special need).

16

served a special need, courts look to whether it "serves as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation." *United States v. Amerson*, 483 F.3d 73, 81 (2d Cir. 2007) (internal quotation marks and alterations omitted). A policy may have "multiple purposes," including one "directly related to crime control," but so long as the "'primary purpose' is a government interest other than crime control . . . the mere fact that crime control is *one* purpose . . . does not bar the application of the special needs doctrine." *Lynch v. City of New York*, 589 F.3d 94, 102 (2d Cir. 2009) (*Lynch I*) (internal quotation marks omitted).

The focus of the "primary purpose" inquiry is on the "immediate objective of the challenged . . . program, not its ultimate goal." *Lynch v. City of New York*, 737 F.3d 150, 158 (2d Cir. 2013) (*Lynch II*) (internal quotation marks omitted). "Because law enforcement involvement always serves some broader social purpose or objective," reliance on a program's ultimate purpose—rather than immediate objective—risks immunizing "virtually

17

any" warrantless search or seizure. *Ferguson v. City of Charleston*, 532 U.S. 67, 84 (2001). Therefore, where a program has an ultimate goal that is unrelated to law enforcement, if it uses the "threat of law enforcement . . . as a means to an end," the immediate objective does not serve a special need. *Id.* at 83–84. To determine a program's "immediate objective," we "conduct a close review" and consider "all the available evidence." *Lynch II*, 737 F.3d at 157–58 (internal quotation marks omitted).

On multiple occasions, we have found that laws affecting convicted sex offenders served special needs as their immediate objectives. In *Doe v. Cuomo*, we upheld, under the special needs doctrine, amendments to SORA's registration requirements that extended the period of registration and eliminated certain forms of relief from those requirements. 755 F.3d 105 (2d Cir. 2014). We held that "any searches or seizures required by SORA serve special needs—such as the protection of potential future victims and the solving of crimes in the future—and purport neither to facilitate the investigation of any specific crime nor primarily to serve a 'general interest

18

in crime control.'" *Id.* at 115 (quoting *Nicholas v. Goord*, 430 F.3d. 652, 663 (2d Cir. 2005)).[13] Similarly, in *Roe v. Marcotte*, we upheld, under the special needs doctrine, a Connecticut statute requiring individuals incarcerated for sex offenses to submit DNA samples to a data bank. 193 F.3d 72 (2d Cir. 1999). We held that program served the government's significant interest in solving past and future crimes, and deterring sex offenders from reoffending in the future. *Id.* at 79–80.

On a close review of the verification program here, we analyze first the stated purpose of the program and then its implementation. *See Nicholas v. Goord*, 430 F.3d at 668 (reviewing public statements and legislative history concerning challenged program to determine whether it served a special need); *Lynch II*, 737 F.3d at 159–62 (reviewing text and implementation of

---

[13] Jones argues that the reasoning of *Doe v. Cuomo* does not apply because SORA's self-reporting requirements "are not at all similar to the invasive intrusions into the home at issue in this case." Appellant's Reply 15. While the intrusiveness and location of the visits are relevant to determine whether the alleged seizures were reasonable, those considerations are not relevant to determine whether the primary purpose of the program was law enforcement. We consider the nature and location of the alleged seizures in balancing the government's need with Jones's liberty interest *infra*.

challenged policy to determine whether it served a special need). We conclude that the verification program serves a special need similar to those identified in *Doe* and *Roe*: reducing sex offender recidivism by improving the accuracy of the registry.

As the contract between SCPD and PFML reflects, the stated purpose of the verification program under the Community Protection Act is to "verif[y] . . . residency reporting of all registered sex offenders." App'x 343. The legislative history for the Act reflects the same goal. When presenting the proposal for the program to County legislators, for example, the County Chief of Police stated that "[i]t's been proven that [the] sex offender registry reduces sex offender recidivism. However, the registry is only good if it's accurate." App'x 1826-27.

PFML's leadership described how an accurate registry reduces recidivism. The organization's executive director testified that the program arose out of complaints from community members that the registry was inaccurate and that the community relies on the registry as "a tool" to "make

good decisions about [with] who[m] they allow[] their children to have relationships." App'x 355. The director stated that research shows that registrants have lower rates of recidivism when they are listed accurately in the registry, but that the registry "needs to be up to date and accurate for it to have efficacy." App'x 357. PFML's controller testified that the registry served the purpose of "provid[ing] accurate information to members of the community so that they can . . . make informed decisions on protecting our most vulnerable." App'x 408. He further testified that the verification program thus served the purpose to "ensure that information provided on the registry was accurate." App'x 408.

The record of the implementation of the program further supports the conclusion that the program did not serve an immediate objective of law enforcement. Over the first three years the program was in effect PFML conducted thousands of home verification visits and referred hundreds of "failures to register home address felony leads" to SCPD for further investigation. App'x 1624. Despite that large volume, SCPD arrested only

21

nineteen people based on PFML tips.[14] Although the fact that tips led to arrests in nineteen cases supports the conclusion that the program, in part, served a law-enforcement purpose, the record does not support a conclusion that the *immediate* objective of the program was "ordinary evidence gathering associated with crime investigation." *Amerson*, 483 F.3d at 81.

In addition, although not alone dispositive, the information transmitted by PFML did not constitute *per se* evidence of a crime. In *Lynch I* and *II*, we reviewed a New York City Police Department policy requiring any officer who discharges his or her weapon and causes death or injury to submit to a breathalyzer test soon after the incident. *Lynch I*, 589 F.3d at 97; *Lynch II*, 737 F.3d at 152. We upheld the policy under the special needs doctrine because it served primarily "personnel management" needs. *Lynch II*, 737 F.3d at 159. We determined that while the breathalyzer tests also

---

[14] The record contains information only concerning the number of referrals made in the first year of the program: 173. App'x 1624. Assuming a constant number of referrals over the next two years, the rate at which referrals were converted to arrests is less than 4%.

served a law enforcement purpose because test results might "*ultimately* provide evidence relevant to a criminal prosecution," the record did not support the conclusion that the "*immediate* object of . . . testing is the procurement of criminal evidence in order to prosecute the police officer in question." *Id.* We relied in part on the fact that an elevated blood alcohol content was not, itself, evidence of a crime and that the tests had never been used as evidence in a criminal prosecution related to the weapons discharge. *Id.*

Similarly here, while PFML worked with SCPD to ensure it collected information in a way that met evidentiary standards, after receiving a tip from PFML that a registrant reported incorrect information, SCPD had to investigate to develop a record of probable cause before making an arrest. For example, a registrant would not be in violation of SORA by having an incorrect address on file if the registrant remained within the ten-day grace period to report change-of-address information under SORA. *See* N.Y. CORRECT. L. § 168-f(4).

23

It is also clear that the verification program did not use the "threat of law enforcement . . . as a means to an end." *Ferguson*, 532 U.S. at 83–84. Instead, the program promoted the state's goal of reducing recidivism largely through means unrelated to criminal prosecution. By improving the accuracy of the registry, the program informed community members of potential risks to help them "make informed decisions" and guard against the possibility of reoffending registrants. App'x 408. An accurate registry also deters registrants from reoffending, as is evidenced by the fact that registered offenders have lower rates of recidivism than those who fail to register.

In sum, the program advances the government's substantial interest in reducing sex offender recidivism by improving the accuracy of the registry. Thus, the program serves a special need "beyond the normal need for law enforcement." *Lynch II*, 737 F.3d at 157 (internal quotation marks omitted).

**B.      Balancing of Interests**

"[T]he fact that the government has a 'special need' does not mean the . . . seizure is 'automatically, or even presumptively' constitutional." *Amerson*, 483 F.3d at 83 (quoting *Illinois v. Lidster*, 540 U.S. 419, 425 (2004)). Instead, we must balance the government's need against the plaintiff's liberty interest to determine whether the alleged seizures were reasonable. We balance four factors:

(1) the weight and immediacy of the government interest; (2) the nature of the liberty interest allegedly compromised by the detention; (3) the character of the deprivation imposed by the detention; and (4) the efficacy of the detention in advancing the government interest.

*Berg v. Kelly*, 897 F.3d at 108 (internal quotation marks and alterations omitted); *see also Lidster*, 540 U.S. at 427–28.

The first and fourth factors weigh heavily in the defendants' favor. Undoubtedly, the government has a substantial interest in reducing sex-offender recidivism. Sex offenders have an unusually high rate of recidivism. *See Smith v. Doe*, 538 U.S. 84, 103 (2003) ("The risk of recidivism posed by sex offenders is 'frightening and high.'" (quoting *McKune v.*

25

*Lile*, 536 U.S. 24, 34 (2002)). The verification program aims to reduce recidivism in Suffolk County by providing community members with accurate information to protect themselves and by deterring registrants from reoffending. Indeed, an accurate registry has been shown to reduce sex-offender recidivism. In addition, the use of home visits is a narrowly-tailored method for verifying home-address information, and thus "bears a close and substantial relation" to the state's special need. *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 676 (1989). The program effectively improved the accuracy of the registry, identifying approximately 13% of registrants whose self-reported home-address information conflicted with their real addresses. Thus, the efficacy of the program and immediacy of the government interest weigh heavily in favor of a finding that the alleged seizures were reasonable.

The third factor, concerning the character of the deprivation, also weighs heavily in the defendants' favor. The detention was brief and unobtrusive. The address verification process lasted mere minutes, and the

RVRs did not request information other than Jones's address and did not touch him or treat him in a threatening or rude manner.

The second factor, concerning the nature of the liberty interest, also does not provide significant support for Jones. It is well-established that specific groups, because of "the special nature of their situation" and "the fact that they are notified in advance" of the policy, "enjoy a diminished expectation of privacy" in certain information. *United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir. 2004); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) ("[T]he legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State."); *cf. MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006) (recognizing that "in most special needs cases the relevant privacy interest is somewhat limited," but concluding that such a diminished interest is not "a *sine qua non* of special needs analysis" (internal quotation marks and citation omitted)). As a registered sex offender, Jones was obligated by state law to periodically provide his home-address information to the state, and he was

given advance notice of that obligation through SORA and the letter from SCPD announcing the verification program. Jones undoubtedly had a diminished expectation of privacy in that information, and by extension lacked a substantial interest in freedom from temporary seizure for the purpose of providing that information to the state.

Jones argues that he has a paramount interest in freedom from government intrusion in his home and, by extension, into the curtilage of his home. Without a doubt, "[w]hen it comes to the Fourth Amendment, the home is first among equals." *United States v. Allen*, 813 F.3d 76, 77 (2d Cir. 2016) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). To the extent that the location of the alleged seizures on the curtilage of his home enhances Jones's liberty interest, that location alone is insufficient to cause this factor to outweigh the other factors.[15]

---

[15] In making this argument, Jones relies on the Supreme Court's decision in *Jardines*, which arose in the search context, for the proposition that the curtilage of the home "enjoys protection as part of the home itself." *Jardines*, 569 U.S. at 6. Neither the parties nor the district court addressed whether *Jardines* and its progeny apply equally to the seizure context, in which "the Fourth Amendment has drawn a firm line at the entrance to the house," affording individuals heightened protection beyond the threshold of their homes. *Payton v. New York*, 445 U.S. 573, 590 (1980). *Compare Allen*, 813 F.3d at 82 (concluding,

Balancing those factors, we conclude that the district court correctly determined that the verification visits, which served a special need, were reasonable, even if they constituted seizures. Accordingly, Jones has not asserted a constitutional deprivation for the purposes of his § 1983 claim and it fails as a matter of law.

**IV.   CONCLUSION**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

without discussion of the curtilage, that "where law enforcement officers have summoned a suspect to the door of his home, and he remains inside the home's confines, they may not effect a warrantless 'across the threshold' arrest in the absence of exigent circumstances"), *with United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018) (concluding that "a search of the curtilage that occurs without a warrant based on probable cause or an exception to the warrant requirement violates the Fourth Amendment"). We need not resolve that issue because we find that any alleged temporary seizures here were reasonable in any event.