UNITED STATES of America,
Appellee,

v.

David A. TITEMORE, Defendant–
Appellant.

Docket No. 05–1380–CR.

United States Court of Appeals,
Second Circuit.

Argued:  Aug. 31, 2005.

Decided:  Feb. 9, 2006.

Elizabeth D. Mann, Assistant Federal Public Defender (Alexander Bunin, Federal Public Defender for the Districts of Northern New York and Vermont, on the brief), Burlington, VT, for Defendant–Appellant.

Paul J. Van De Graaf, Assistant United States Attorney (David V. Kirby, United States Attorney for the District of Vermont, on the brief), Burlington, VT, for Appellee.

Before: WALKER, Chief Judge, CALABRESI and STRAUB, Circuit Judges.

JOHN M. WALKER Jr., Chief Judge.

Defendant-appellant David A. Titemore appeals from a March 14, 2005, judgment of the United States District Court for the District of Vermont (William K. Sessions, III, *Chief Judge* ), convicting him, after his guilty plea, of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). On this appeal, Titemore challenges the district court's September 15, 2004, order denying his motion to suppress both evidence of his possession of a rifle and incriminating statements made to a state trooper. *United States v. Titemore*, 335 F.Supp.2d 502 (D.Vt.2004). Specifically, Titemore argues that the evidence should be suppressed because, by walking across Titemore's lawn to question him at a side porch, the trooper invaded the curtilage of his home in violation of the Fourth Amendment. Titemore also argues that, under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the district court erred when it failed to suppress evidence of incriminating statements that he made to the trooper. Because the trooper approached a principal entrance to the home using a route that other visitors could be expected to take, we hold that the trooper's actions did not offend the Fourth Amendment. We also hold that the district court did not err in holding that *Miranda* did not bar the admission of Titemore's statements to the trooper. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

The basic facts underlying Titemore's federal prosecution stem from a property dispute between neighbors near the shores of Lake Carmi in Franklin, Vermont. On April 27, 2003, the Vermont State Police responded to a dispute between David Titemore and his neighbor, Kevin Lothian, upon information that Titemore had assaulted one of Lothian's employees by striking him with the bucket of a tractor. An officer issued a citation to Titemore to appear in the Vermont District Court on a simple assault charge.

On the following evening, Lothian returned to his home to find that it had been vandalized. He called the Vermont State Police at about 7:20 p.m. to report that his door had been kicked in, a pool table was damaged, and a .22 Marlin rifle had been stolen.[1] Lothian and a friend, Larry Tatro, waited for the police in Lothian's home. At about 8:40 p.m. they saw Titemore come on to Lothian's property.[2]

---

1. The district court stated that ammunition also had been taken from Lothian's residence, *Titemore*, 335 F.Supp.2d at 504; we simply note that Lothian did not report that ammunition had been stolen until after Trooper Baxter had secured both the rifle and the ammunition.

2. Although the district court found that Lothian "observed Titemore and another individual arrive at his residence and engage in further vandalism," *Titemore*, 335 F.Supp.2d at 504, there is no record support that somebody else was with Titemore when he returned to Lothian's property.

They watched Titemore smash some lights, "play" with a propane tank, and attempt to enter the residence. This prompted Lothian to place a second call to the Vermont State Police. The dispatcher patched Lothian's call through to Trooper Thad Baxter. At the end of a brief telephone conversation in which Lothian explained the situation, Trooper Baxter and Lothian agreed to meet on Main Street in downtown Franklin, Vermont.

At about 10:00 p.m., Trooper Baxter met Lothian and Tatro on Main Street. Again, Lothian explained the situation to the trooper—that his home had been vandalized, that his rifle was missing, and that he had watched Titemore return to the property to engage in further vandalism. Lothian also described to Trooper Baxter the positioning of the homes off of Patton Shore Road. As Trooper Baxter recalled at the suppression hearing, Patton Shore Road runs in a north-south direction on the western edge of Lake Carmi; Lothian's house lies just south of Tatro's on the eastern side of the road, next to the lake; and Titemore's house lies slightly to the south, and to the west, of Lothian's, on the western side of the road at the intersection of Patton Shore Road and Titemore Woods Road. Lothian then agreed to lead Trooper Baxter to the area. The three men traveled to Patton Shore Road and parked at Tatro's house.

From Tatro's residence, the three men walked south along Patton Shore Road in the direction of Lothian's residence. As they walked, Lothian asked the trooper if he wanted to inspect the property damage at his residence; Trooper Baxter said that he would prefer to go speak with Titemore first.

At about 10:20 p.m., Trooper Baxter, Lothian, and Tatro arrived at the edge of Titemore's property. Trooper Baxter advised Lothian and Tatro to stay near the road while he approached Titemore's house. The two men were nervous, however; they informed Trooper Baxter that Titemore was probably drunk and most likely had Lothian's rifle. They were concerned that if Titemore mistook the trooper for Lothian, Trooper Baxter might get shot. They advised Trooper Baxter to approach a door on the western side of Titemore's property, which was equipped with a motion-sensing light that would illuminate Trooper Baxter's uniform, making him easily recognizable to anyone inside the residence. Trooper Baxter told Lothian and Tatro that he would figure out how to proceed as he approached the house. He was aware that Titemore was a convicted felon.

Titemore's home is a small, rectangular-shaped house with a pitch-roof and three dormer windows that jut from the southern face of the sloped roof. The broad sides of the rectangular home face north and south, but have no doors. On the eastern side of the house, a set of sliding-glass doors open onto a small, relatively open, porch that sits roughly three feet off the ground. On the wall next to the sliding-glass door, there is a light and a non-functioning doorbell. On the western side of the house, a small door (with a working doorbell and a welcome mat) opens onto a driveway that runs north to south where it connects to Titemore Woods Road. At the top of the driveway a small garage is attached to the northwestern corner of Titemore's home.

The home is located on land adjacent to the intersection of Titemore Woods and Patton Shore Roads, just north of the former and west of the latter. The two sides of the property not adjacent to the roads are demarcated by a thicket of woods and a fence along the western edge of the property. Along the southern side of the property, there is a one-and-a-half-foot

deep and four-foot wide grass-covered drainage ditch or depression that parallels Titemore Woods Road and feeds into a culvert that passes under the driveway. And on the eastern side of the property, a split-rail fence parallels Patton Shore Road from the corner of the intersection until the fence gives way to a line of trees that continues north. Because the fence runs right next to the road, but the trees are set back slightly from the edge of the property, there is a gap between the fence and the trees wide enough to permit a person to pass through. Together, these man-made and natural objects help to define the shape of the property; yet the house still appears to sit on a relatively open lot that can be viewed without obstruction from either Titemore Woods or Patton Shore Road.

When Trooper Baxter stood near the intersection of Titemore Woods and Patton Shore Roads, it was dark. If it had been light, however, Trooper Baxter would have seen no traditional front door along the southern side of Titemore's home, but rather the sliding-glass door that opened onto the small porch on the eastern side of the house. At the same time, he had been informed by Lothian and Tatro of the second entrance on the western side of the house that opened onto the driveway and had the motion-sensing light.

As Trooper Baxter approached the house, he saw the flickering blue hue of a television set illuminate the sliding-glass door near the eastern side-porch. He decided to walk towards the porch and knock on the sliding-glass door. As the district court found, he chose this route for two principal reasons: (1) because the television was on in the room adjacent to the porch, he thought that he was more likely to find Titemore if he knocked on the sliding-glass door next to that room; and (2) Baxter was concerned about approaching from the western side of the house because the motion-sensing light would permit Titemore to see him approach, but he would not be able to see Titemore. Thus, Trooper Baxter necessarily walked around the split-rail fence, over the shallow grass-covered depression, and across Titemore's front lawn to a set of steps that lead up to the porch and the sliding-glass door.

When Trooper Baxter arrived on the porch, he found that the glass door had been left open, but a screen-door remained closed. As Baxter peered through the screen, he could see Titemore facing him, watching the television, which was next to the door. The trooper also noticed a rifle lying within Titemore's reach, at the foot of the chair that he was sitting on. At this point, Trooper Baxter introduced himself and briefly shined his flashlight upon his uniform so that Titemore could see that he was a police officer. According to Baxter, Titemore was acting strangely, sitting in his chair and staring "through" the trooper. After Baxter asked the defendant if he was David Titemore, Titemore nodded slowly.

Trooper Baxter asked Titemore if either he could enter the house or Titemore would come out to talk. Titemore stepped onto the porch. When Baxter spoke to Titemore, he detected the odor of alcohol on Titemore's breath. The trooper also noticed that Titemore's thought processes appeared slowed and his speech slurred. Baxter asked Titemore if he had ever been convicted of a felony; Titemore responded, "I may have been once." Baxter then asked Titemore if he was supposed to have a gun, to which Titemore replied, "no." Baxter also asked Titemore the make of the gun and whether it was loaded; Titemore replied that it was a Marlin and that it was loaded.

Although Baxter told Titemore that he had come to Titemore's home to ask about the vandalism at Lothian's house, he informed Titemore that first he wanted to deal with the rifle. Trooper Baxter then informed Titemore that he needed to retrieve the rifle and he asked permission to do so. Titemore said yes. At this point, Baxter opened the screen door, walked into the room, retrieved the rifle, and immediately walked back onto the porch. Baxter then asked Titemore how to unload the weapon; Titemore explained that Baxter needed to remove the spring-rod from the bottom of the rifle. Trooper Baxter then unloaded the weapon, which included removing a bullet from the chamber.

With the rifle secured, Baxter asked Titemore about the vandalism at Lothian's house. Titemore replied that he had been at home all day and had not visited Lothian's property. Titemore also claimed that Lothian had struck him in the face on the previous evening. Baxter issued Titemore a citation to appear in court for the offence of unlawful mischief and unlawful trespass. Baxter then left the residence, carrying the rifle and the bullets.

A grand jury returned a three-count indictment, charging Titemore with (1) possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); (2) possession of a firearm by a person who had previously been convicted of a misdemeanor crime of domestic violence in violation of 18 U.S.C. § 922(g)(9); and (3) possession of a stolen firearm in violation of 18 U.S.C. § 922(j).

Titemore moved to suppress evidence of his possession of the rifle as the fruit of an unlawful entry onto the property under the Fourth Amendment and the incriminating statements to Trooper Baxter as a violation of his *Miranda* rights. After an evidentiary hearing, the district court issued a memorandum opinion and order denying the motion to suppress. *United States v. Titemore*, 335 F.Supp.2d 502 (2004). The district judge recognized that the Fourth Amendment's protection extends to the curtilage surrounding a home. He held, however, that an officer does not offend the Fourth Amendment when he approaches any part of a building where uninvited visitors could be expected and that it was reasonable for Baxter to approach the sliding-glass door. After determining that Baxter was lawfully at the sliding-glass door, the district judge held that the seizure of the rifle was justified by exigent circumstances. Finally, the district judge held that the discussion between Baxter and Titemore did not offend *Miranda* because Titemore was not in custody, a precondition for the requirement of *Miranda* warnings.

Titemore subsequently entered into an agreement to plead guilty to count one of the indictment charging possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). In return, the government agreed to move to dismiss the remaining counts and to recommend that Titemore receive credit for his acceptance of responsibility under the Sentencing Guidelines. Titemore reserved his right to appeal from the district court's denial of his motion to suppress.

At a subsequent sentencing proceeding, the district court sentenced Titemore to seventy months' imprisonment and three years' supervised release. This appeal followed.

## DISCUSSION

On appeal, Titemore argues that, because the lawn and deck of a home are intimately associated with the home itself, they are within the protected curtilage of the home. Based on this argument, Titemore contends that Trooper Baxter violat-

ed the Fourth Amendment by effecting a "warrantless entry onto [his] protected property." Titemore argues further that any evidence or statements that were derived from that unlawful entry must be suppressed because they were obtained by the trooper from an "unlawful vantage point."

Titemore contends that his statements to Trooper Baxter should be suppressed for the further reason that they were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, he argues that he was "deprived of his freedom of action" in a "significant way" when the trooper questioned him without issuing *Miranda* warnings and therefore suppression is required. While the first argument requires a more elaborate response, we conclude that neither has merit.

## I. Curtilage Argument

Before *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court "often used the concept of a 'constitutionally protected area' to define the reach of the Fourth Amendment's protections." 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3, at 554 (4th ed.2004) (quoting *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). But *Katz* signaled the demise of the habit of conceptualizing areas of constitutional protection; *Katz* reminded us that "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351, 88 S.Ct. 507.

While the majority opinion in *Katz* shifted the focus in cases involving the Fourth Amendment, from places to people, it was Justice Harlan's concurrence that provided the analytical framework for the future:

As the Court's opinion states, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. *Cf. Hester v. United States*, [265 U.S. 57, 44 S.Ct. 445 (1924) ].

*Id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring). The "reasonable expectation of privacy" test, as articulated in Justice Harlan's concurrence, was adopted by a majority of the Court a little over a decade later. *Smith v. Maryland*, 442 U.S. 735, 740–41, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

As Justice Harlan's concurrence made plain, however, *Katz* did not eliminate all constitutional significance of the particular place that a search or seizure occurred; it remained relevant to the expectation of privacy analysis at both the subjective and objective levels. *See Katz*, 389 U.S. at 361–62, 88 S.Ct. 507 (Harlan, J., concurring); *see also* 1 LaFave, *supra* § 2.3, at 554–55 (stating that " 'reference to a place' is ordinarily necessary in deciding what protection the Fourth Amendment affords to people").

The continued significance of "place," albeit as a more limited analytical tool, is borne out by the Supreme Court's discussion, for Fourth Amendment purposes, of the "curtilage" surrounding a home and its correlative, the "open fields"—a discussion that both antecedes and post-dates *Katz*. In *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), Justice Holmes excluded "open fields" from Fourth Amendment protections. *Hester*, 265 U.S. at 59, 44 S.Ct. 445 (holding that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects' is not extended to the open fields"). In support of this proposition, Justice Holmes noted: "The distinction between the [open fields] and the house is as old as the common law." *Id.* (citing William Blackstone, 4 Commentaries *223, 225, 226).

Justice Holmes's reference to Blackstone's Commentaries was to a principal limitation of common law burglary, which distinguished between the open fields and the house. The common law definition of burglary was the breaking and entering of a mansion-house, at night, with the intent to commit a felony inside. William Blackstone, 4 Commentaries *224. Although treading upon another's land itself represented the offence of trespass, the "heinous offence" of disturbing another's "right of habitation" was reserved for burglary. *Id.* at *223. Thus, in order to qualify for this more serious crime, it was "indispensably necessary" that the breaking and entering be of a "mansion or dwelling house[; f]or no distant barn, warehouse, or the like, are under the same privileges, nor looked upon as a man's castle of defence . . . ." *Id.* at *225. Within this general distinction, however, the common law accorded to subordinate structures the same privileges as those enjoyed by the master house, provided that they were within the "curtilage" of the home.

*Id.* (stating that "if the barn, stable, or warehouse be a parcel of the mansion house, and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall"). Conversely, structures erected in the open fields lay outside the protection of the curtilage, and were thus outside the common law definition of burglary. *See id.*; Note, Brendan Peters, *Fourth Amendment Yard Work: Curtilage's Mow–Line Rule*, 56 Stan. L.Rev. 943, 952–55 (2004) (explaining that, under the common law, only structures located within the curtilage, not the land or yard that was also located within the boundaries of the curtilage, "were granted the same protection under the law of burglary as afforded to the house itself").

*Hester* represents the Court's first acceptance of Blackstone's distinction between the open fields and the curtilage and its application of that distinction in the Fourth Amendment context. *United States v. Reilly*, 76 F.3d 1271, 1275 (2d Cir.1996). Four years later, in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), "the Supreme Court extended Justice Holmes' pronouncement to hold that no [property-related] 'search or seizure' occurred unless the government had made an 'actual physical invasion of [the defendant's] house 'or curtilage.' '" *Id.* (second alteration in the original) (quoting *Olmstead*, 277 U.S. at 466, 48 S.Ct. 564).

The Supreme Court in recent years has kept Blackstone's distinction as an analytical tool, but applied it within the *Katz* framework and Justice Harlan's concurrence in that case. In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court

articulated the rule announced in *Hester*—that the Fourth Amendment does not extend to the open fields—in terms of the reasonable-expectation-of-privacy doctrine. *Oliver*, 466 U.S. at 177–78, 104 S.Ct. 1735. Thus, "the rule of *Hester v. United States* ... may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178, 104 S.Ct. 1735. Put differently, "the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.'" *Id.* at 179, 104 S.Ct. 1735.

The situation differed, however, with respect to the curtilage surrounding the home, which, according to dicta in *Oliver*, was capable of harboring a reasonable expectation of privacy. *Id.* at 180, 104 S.Ct. 1735. The Court stated the distinction as follows:

> At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Conversely, the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.

*Id.* (citations omitted).

In *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Court squarely recognized as reasonable an expectation of privacy within the curtilage surrounding the home and gave clues as to how courts should determine its boundaries. *Dunn*, 480 U.S. at 300–01, 107 S.Ct. 1134; *see also Reilly*, 76 F.3d at 1275 n. 1 (recognizing that the question whether one can have a reasonable expectation of privacy in curtilage was settled as a matter of law by *Dunn*). The Court explained that "the extent of curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself"—the "central component of this inquiry" being "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn*, 480 U.S. at 300, 107 S.Ct. 1134 (internal quotation marks and citations omitted).

The *Dunn* Court, however, did not attach Fourth Amendment significance to curtilage *per se*, only to the reasonable expectation of privacy that might occur with reference to it. In the words of Judge Friendly: "Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis." *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir.1980). Even if society is willing to recognize certain general areas as curtilage, that determination does not answer the two principal questions, objective and subjective, that must be resolved under the Fourth Amendment: first, whether society would recognize the particular area claimed as within the curtilage of the home; and second, whether the defendant has manifested a subjective expectation of privacy in that area. Thus, it is possible that an area might fall within the curtilage of the home, as that concept was defined at common law, but the owner or resident may fail to manifest a subjective expectation of privacy in that area. *Cf.* 1 LaFave, *supra* § 2.3(f), at 559 (stating the "portion of the curtilage [that is

used as a] normal route of access for anyone visiting the premises[ ] is 'only a semi-private area' ") (quoting *United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir. 1975)); *see also Oliver*, 466 U.S. at 178–80, 104 S.Ct. 1735 (explaining that curtilage represents the extent of the area surrounding a home that is capable of being recognized as private under the objective component of the reasonable-expectation-of-privacy test).

■ "The touchstone of our inquiry, therefore, remains whether [the defendant] had a reasonable expectation of privacy in [the area near the home that he claims to be protected by the Fourth Amendment]." *Reilly*, 76 F.3d at 1276; *see also Tri–State Steel Constr., Inc. v. Occupational Safety & Health Review Comm'n*, 26 F.3d 173, 178 (D.C.Cir.1994) (Williams, J., concurring in the result) (explaining that *Dunn* is "a special case of the more general doctrine that a reasonable expectation of privacy is necessary for a successful [Fourth] Amendment claim"); *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir.1982) (*per curiam*) ("The standard for determining when the search of an area surrounding a residence violates fourth amendment guarantees no longer depends on outmoded property concepts, but whether the defendant has a legitimate expectation of privacy in that area."); *Arboleda*, 633 F.2d at 992 (stating that the relevant question, under Fourth Amendment curtilage analysis, is "whether the defendant has a legitimate expectation of privacy in the area"); *Magana*, 512 F.2d at 1170 ("The driveway where Magana was arrested was within the curtilage of the house Magana was using, but 'a reasonable expectation of privacy,' and not common-law property distinctions, now controls the scope of the Fourth Amendment." (citation omitted)). Accordingly, to decide this case we must ask whether Titemore had a rea-sonable expectation of privacy in the porch and the track of lawn that the trooper used to reach its stairway.

We have little difficulty concluding that Titemore cannot claim a reasonable expectation of privacy in these areas. First, while the sliding-glass door and porch are connected to the house and, in this respect, would tend to support a finding that they are within the curtilage of the home, they also constitute part of a principal entrance-way, which has associated with it a diminished expectation of privacy. *See, e.g., United States v. Taylor*, 90 F.3d 903, 908–09 (4th Cir.1996). Second, viewing the features of the property "within the larger context of the total property," *United States v. Lace*, 669 F.2d 46, 56 (2d Cir. 1982) (Newman, J., concurring), we agree with the district court that the porch area and lawn were not completely enclosed, and thus separated from the public, because no fence was present on Titemore Woods Road, *see Reilly*, 76 F.3d at 1278. Third, the evidence established that the sliding-glass door was in fact a primary entrance visible to and used by the public. The porch, door, and lawn faced Patton Shore Road and were visible from both Patton Shore and Titemore Woods Roads. Three steps led up to the porch, indicating that it was a means of ingress and egress. And there was also a doorbell, albeit one that was not working, which would suggest to visitors that they could visit the home from the porch. Fourth, the record evidence showed that no steps were taken to shield the sliding-glass door and porch from outside observation. The door, visible from both roads, was open, radiating light from the television set out onto the lawn, and the porch was not enclosed, as *the trooper could observe from the road-way.*

Thus, there was no offense to the Fourth Amendment when Trooper Baxter

approached the sliding-glass door to talk to Titemore about the vandalism that took place on the Lothian property. Accordingly, neither the rifle seized by the trooper, after gaining Titemore's consent, nor Titemore's statements was the fruit of an unlawful entry. In reaching this result, we join our sister circuits in holding that when a police officer enters private property for a legitimate law enforcement purpose and embarks only upon places visitors could be expected to go, "observations made from such vantage points are not covered by the Fourth Amendment." 1 LaFave, *supra* § 2.3(f), at 600–02; *see also United States v. Daoust,* 916 F.2d 757, 758 (1st Cir.1990) (Breyer, C.J.) ("A policeman may lawfully go to a person's home to interview him.").[3]

## II. *Miranda* Argument

■ We easily dispense with Titemore's claim that, under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the district court should have suppressed the incriminating statements that he made to the trooper in the absence of receiving *Miranda* warnings. For *Miranda* to apply, the defendant must be in custody. *E.g., United States v. Newton,*

369 F.3d 659, 669 (2d Cir.2004). Titemore, however, was never placed under arrest, nor restrained in any way. The trooper asked Titemore to step outside to talk with him. The trooper then asked about Titemore's previous felonies; whether he was supposed to have a gun, along with its make; and whether it was loaded. Knowing that Titemore was a convicted felon and detecting alcohol on his breath, the trooper then obtained Titemore's consent to retrieve the weapon. The trooper concluded the interview not by taking Titemore into custody but by issuing a citation that required a future appearance. Under these circumstances, the district court properly denied the motion; simply put, Titemore was never subject to a custodial interrogation by the police or otherwise deprived of his freedom. *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**3.** *United States v. Raines,* 243 F.3d 419, 420–21 (8th Cir.2001) (holding that the officer "did not interfere with [the defendant's] privacy interest when he, in good faith, went unimpeded to the back of [the defendant's] home to contact the occupants of the residence" by walking through a ten-foot wide opening in a wall of debris that acted as a make-shift fence around the perimeter of the property); *United States v. Thomas,* 120 F.3d 564, 571–72 (5th Cir.1997) (finding that the police did not violate the Fourth Amendment when they approached the front door of an apartment by walking through an open gate because "the officers could reasonably believe that the gate provided the principal means of access to the apartment"); *United States v. Taylor,* 90 F.3d 903, 908–09 (4th Cir.1996) (holding that police officers did not offend the Fourth Amendment when they looked into a window as they approached the front door to

a house because the route "was as open to the law enforcement officers as to any delivery person, guest, or other member of the public"); *United States v. Garcia,* 997 F.2d 1273, 1279 (9th Cir.1993) (recognizing "that officers walking up to the front door of a house can look through a partially draped open window without conducting a Fourth Amendment search"); *cf. United States v. Reyes,* 283 F.3d 446, 467 (2d Cir.2002) (finding no Fourth Amendment violation when the police entered a driveway because the "driveway led to the street and could be viewed in its entirety from the street"); *United States v. Evans,* 27 F.3d 1219, 1228 (7th Cir.1994) (holding that "[t]he agents' approach to the garage did not implicate a Fourth Amendment interest because Evans did not present any evidence at the suppression hearing that he had a reasonable expectation of privacy in the driveway").