13-3333-cr
United States v. Allen

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————

August Term, 2013

(Argued: December 5, 2013    Decided: January 29, 2016)

Docket No. 13-3333-cr

————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

DENNIS B. ALLEN, JR.,

*Defendant-Appellant.*[*]

————

B e f o r e:

SACK, LYNCH, and LOHIER, *Circuit Judges.*

————

———————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

1

Dennis B. Allen, Jr., appeals from a judgment of the United States District Court for the District of Vermont (Christina Reiss, *Chief Judge*) denying his motion to suppress physical evidence recovered and statements made following his warrantless arrest while he was standing inside the threshold of his home. The district court held that Allen's arrest did not violate the Fourth Amendment. We disagree, and VACATE the judgment of conviction, REVERSE the denial of the suppression motion, and REMAND the case for further proceedings consistent with this opinion.

VACATED AND REMANDED.

JUDGE LOHIER concurs in a separate opinion.

———————————

DAVID L. MCCOLGIN, Assistant Federal Public Defender, *for* Michael L. Desautels, Federal Public Defender for the District of Vermont, Burlington, Vermont, *for* Defendant-Appellant.

WILLIAM B. DARROW, Assistant United States Attorney (Gregory L. Waples, Assistant United States Attorney, *on the brief*), *for* Tristram J. Coffin, United States Attorney for the District of Vermont, Burlington, Vermont, *for* Appellee.

———————————

GERARD E. LYNCH, *Circuit Judge*:

"[W]hen it comes to the Fourth Amendment, the home is first among equals."  Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013).  At the Amendment's "very core stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion."  Silverman v. United States, 365 U.S.

505, 511 (1961).  In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court

held that, in the absence of exigent circumstances, the Amendment prohibits law

enforcement officials from making a warrantless and nonconsensual entry into a

suspect's home to arrest him.

Defendant-appellant Dennis B. Allen, Jr., appeals from a judgment of the

United States District Court for the District of Vermont (Christina Reiss, *Chief

Judge*) convicting him, upon entry of a conditional guilty plea, of being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  The district court

entered its judgment after denying Allen's motion to suppress statements and a

gun obtained following a warrantless arrest by local police officers at the front

door of his home.  The district court concluded that although Allen was inside

the threshold of his home when he was arrested, no Fourth Amendment

violation occurred because the police were able to effect the arrest without

crossing the threshold themselves.

This a liminal case, which presents a close line-drawing problem.[1]  If the

---

[1] The case is liminal in the ordinary English meaning of the word, in that it rests "on a boundary or threshold, . . . by being transitional or intermediate between two states [or] situations."  Oxford English Dictionary (3d ed.) (defining liminal). It is even more literally liminal, since the word derives from the Latin "*limen*," which means the physical threshold of a house, which is the boundary between the two clear rules.

officers had gone *into* Allen's apartment without a warrant to effect the arrest, the arrest would violate the Constitution; if Allen had come *out of* the apartment into the street and been arrested there, no warrant would be required. We conclude that the protections of Payton are primarily triggered by the *arrested person's* location and do not depend on the location or conduct of the arresting officers. Because it is uncontested that Allen remained inside his home, and was in his home when the officers placed him under arrest, his warrantless arrest in the absence of exigent circumstances violated the Fourth Amendment. We therefore vacate the judgment of conviction, reverse the denial of the suppression motion, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

I.    Facts

The facts are not in dispute. On July 25 or 26, 2012, the Springfield, Vermont Police Department received a written complaint that on July 23, John Johnston had been assaulted by a man known to him only as "D.J." A Springfield police officer interviewed Johnston on July 26, and based on that interview, and the officer's prior experience, he concluded that "D.J." was in fact Allen.

4

On July 27, 2012, four Springfield police officers went to Allen's apartment with the "pre-formed plan . . . to arrest [him] for the alleged assault and process him . . . at the Springfield police station." J.A. 137.[2] Despite having nearly two days and ample probable cause,[3] the officers did not seek a warrant for Allen's arrest. Allen's apartment was located on the second and third floors of a three-story building that housed a hair salon on the first floor. The front door to Allen's apartment was on the street level, and led directly to a hallway and staircase to the second floor. Neither the entrance, the hallway, nor the staircase was shared by other tenants.

After they arrived, the officers knocked on Allen's door. Allen heard the knock, and stepped onto his second-floor porch. One of the officers requested that Allen come down to speak with him; Allen complied. Allen opened the door to his apartment, and during the next five to six minutes that he spoke with the officers, he remained "inside the threshold" while the officers stood on the

---

[2] See also J.A. 136 (district court noting that officers "travelled [sic] to Defendant's apartment intending to . . . arrest him").

[3] Allen has never challenged his arrest on the basis of lack of probable cause.

sidewalk. The district court noted that during the encounter, "[n]o weapons were drawn and the officers did not physically touch [Allen]." J.A. 137.

Allen told the officers that although he knew Johnston, he had not assaulted him, and had not seen him in several days. Explaining that Johnston had called him several times, Allen at one point handed the officers his cell phone so that they could view his call log. The officers looked at the phone, and returned it to Allen. The officers then told Allen that he would need to come down to the police station to be processed for the assault. In other words, he was under arrest. Allen, who had appeared at the door in his stocking feet, asked whether he could retrieve his shoes and inform his 12-year-old daughter, who was upstairs in the apartment, that he would be leaving with the officers. The officers advised Allen that he could not return upstairs unless they accompanied him, which they did.[4]

Once inside the apartment, one of the officers asked Allen whether he had anything in his pockets; Allen took out several items, including seven bags of marijuana. Officers also saw what appeared to be drug paraphernalia in plain

---

[4] On appeal, Allen does not challenge the determination that once he was under arrest, as a matter of law, officers had a "right to remain literally at [his] elbow at all times." J.A. 148, quoting Washington v. Chrisman, 455 U.S. 1, 6 (1982).

6

view.  Officers escorted Allen out of the apartment, where he was then handcuffed, placed in the police cruiser, and transported to the police station.

Based in part on the drug paraphernalia that they saw inside the apartment, as well as the bags of marijuana in Allen's pockets, the officers applied for and obtained a search warrant.  While executing that warrant, the officers recovered, among other things, a hand gun and various drug paraphernalia.  Prompted by the fruits of that search, federal agents later rearrested Allen on the federal charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Allen admitted to the agents that he possessed the firearm.

II.    Prior Proceedings

After being indicted by a federal grand jury for his violation of 18 U.S.C. § 922(g)(1), Allen moved to suppress the firearm, and the statements he made, contending that both were fruits of a warrantless in-home arrest in violation of the Fourth Amendment.  A one-day hearing followed, at which Allen and one of the Springfield police officers who initially arrested him testified.  After the hearing, the district court denied Allen's motion in a written opinion and order.

7

United States v. Allen, No. 5:12-cr-130-1, 2013 WL 1736665 (D. Vt. Apr. 22, 2013).[5]

The district court cited California v. Hodari D., 499 U.S. 621, 626 (1991) to conclude that Allen was arrested "while [he] was inside the threshold of his apartment and the officers were outside on the sidewalk." J.A. 141. Under Hodari D., "[a]n arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." 499 U.S. at 626. The district court reasoned that Allen submitted to the officer's authority once he asked for permission to say goodbye to his daughter and retrieve his shoes. Accordingly, the district court determined that Allen was subjected to an "'across the threshold' arrest," a conclusion that neither party directly challenges on appeal.[6]

---

[5] While this citation to an electronic version of the district court's opinion and order is provided for ease of reference, all direct citations of that opinion are taken from the Joint Appendix.

[6] We agree with the district court's legal conclusion that Allen was subject to an "across the threshold arrest," but do not agree that Hodari D., provides the proper analytical framework. In that case, the Supreme Court held that a suspect fleeing police in a street encounter was not arrested because he did not "*submi[t]* to the assertion of authority" by the police officer who ordered him to stop. See Hodari D., 499 U.S. at 625-26. There was, therefore, no Fourth Amendment seizure until the officer tackled the suspect. Neither the parties nor the district court cites appellate authority applying Hodari D. in the context of citizen-police encounters in the home. In that context, we believe that the traditional totality-of-the-circumstances analysis provides the appropriate framework. See United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized'

The district court then analyzed whether such an "across the threshold" arrest triggers the rule of Payton v. New York, 445 U.S. 573 (1980), when law enforcement officers have summoned the defendant to that location. Canvassing precedent from the Supreme Court, this Court, and other courts of appeals, the district court acknowledged that the case presented a "close[ ] question," but concluded that the "pivotal inquiry is whether law enforcement crossed the threshold of the home in order to effectuate the arrest." J.A. 145. Accordingly, the district court determined that Allen's arrest did not violate the Fourth Amendment, and denied his suppression motion.

Thereafter, with the Government's consent, Allen entered a conditional guilty plea to the felon in possession charge, reserving his right to appeal the denial of the suppression motion. The district court entered judgment, sentencing Allen to 23 months' imprisonment, two years' supervised release, and imposed a $100 special assessment. This timely appeal followed, and we now reverse.

---

within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). Applying that test de novo, we conclude that Allen was arrested while standing inside the threshold of his home, and therefore agree that this case concerns an "across the threshold" arrest. In any event, however, neither party disputes that Allen was arrested while he was still inside his home.

## DISCUSSION

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Amendment, therefore, "indicates with some precision the places and things encompassed by its protections: persons, houses, papers, and effects." Jardines, 133 S. Ct. at 1414 (internal quotation marks omitted). But the home is "first among equals," because at the Amendment's "very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Id. (internal quotation marks omitted). Accordingly, "seizures inside a home without a warrant are presumptively unreasonable." Payton, 445 U.S. at 586.

In Payton, the Supreme Court held that the police violated the Fourth Amendment by physically entering a home without a warrant to effect an arrest. The Court noted that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." 445 U.S. at 585 (internal quotation marks omitted). Quoting with approval this Court's decision in United States v. Reed, 572 F.2d 412, 423 (2d Cir. 1978), the Court went on to explain the

10

general rationale for prohibiting warrantless arrests inside the home in the absence of an exigency:

> To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when . . . probable cause is clearly present.

Id. at 588-89. It is therefore settled law that, at a minimum, law enforcement officers violate Payton when, in the absence of exigent circumstances or consent, they physically enter protected premises to effect a warrantless search or arrest. See United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013); see also Loria v. Gorman, 306 F.3d 1271, 1286 (2d Cir. 2002) (denying qualified immunity because "no reasonable officer could have concluded that . . . taking two steps into the house . . . did not constitute a Fourth Amendment entry").

Some of our sister circuits have read Payton narrowly, and appear to conclude that there is no Payton violation unless police physically cross the threshold and enter the home. See Knight v. Jacobson, 300 F.3d 1272, 1277 (11th Cir. 2002); United States v. Berkowitz, 927 F.2d 1376, 1386-88 (7th Cir. 1991); United States v. Carrion, 809 F.2d 1120, 1128 (5th Cir. 1987). Other circuits have

11

eschewed that narrow reading, concluding that law enforcement officers may violate <u>Payton</u> without physically entering the home. <u>See</u>, <u>e.g.</u>, <u>Fisher v. City of San Jose</u>, 558 F.3d 1069, 1074-75 (9th Cir. 2009) (en banc); <u>United States v. Saari</u>, 272 F.3d 804, 807-08 (6th Cir. 2001); <u>United States v. Reeves</u>, 524 F.3d 1161, 1165 (10th Cir. 2008). Those cases hold that the "officers need not physically enter the home for <u>Payton</u> to apply," partially because "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." <u>Reeves</u>, 524 F.3d at 1165 (internal quotation marks omitted). Those cases, however, tend to rely on the legal fiction of constructive or coercive entry, a doctrine under which certain types of police conduct will be deemed an entry.[7] Under that doctrine, when officers engage in actions to coerce the occupant outside of the home, they "accomplish[] the same thing" and achieve the same effect as an actual entry, and therefore trigger <u>Payton</u>'s protections. <u>See</u> <u>United States v. Morgan</u>, 743 F.2d 1158, 1166 (6th Cir. 1984).

While entitled to due regard, those cases of course do not bind us. Nor do any of this Court's cases decisively answer the question presented by this appeal,

---

[7] <u>See generally</u> Steven B. Dow, <u>"Step Outside Please": Warrantless Doorway Arrests and the Problem of Constructive Entry</u>, 45 New Eng. L. Rev. 7 (2010).

namely, whether <u>Payton</u> permits warrantless "across the threshold" arrests where law enforcement officers have summoned the suspect to the front door of his home. While <u>Payton</u> recognizes that "physical entry of the home is the *chief evil* against which the wording of the Fourth Amendment is directed," 445 U.S. at 585 (emphasis added) (internal quotation marks omitted), the Supreme Court has "refused to lock the Fourth Amendment into instances of actual physical trespass." <u>United States v. United States District Court for E. Dist. Of Mich.</u>, 407 U.S. 297, 313 (1972). The principles reflected in the Fourth Amendment "'reached farther than the concrete form' of the specific cases that gave it birth, and 'apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life.'" <u>Payton</u>, 445 U.S. at 585, quoting <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886). In light of those principles and for the reasons that follow, we conclude that where law enforcement officers have summoned a suspect to the door of his home, and he remains inside the home's confines, they may not effect a warrantless "across the threshold" arrest in the absence of exigent circumstances.

This Court's seminal case analyzing warrantless arrests in the home, <u>Reed</u>, predates <u>Payton</u>. There, we addressed the "important and [as of that time] oft-

reserved question whether and under what circumstances federal law enforcement officers may enter the home of a suspect in order to effect a felony arrest for which they have statutory authority and probable cause but no warrant." 572 F.2d at 414. Three armed federal agents knocked on the door of Reed's apartment, and Reed opened the door. Id. at 415. The testimony about what transpired next differed. Reed testified "that the agents 'rushed in' immediately after she pulled the door open and then arrested her." Id. at 422. One of the arresting agents, however, "testified that he placed Reed under arrest in the living room-dining room part of the apartment *after advising her at the door* that his purpose was to place her under arrest." Id. (emphasis added). The district court, we noted, "believed that Reed was arrested when she opened the door." Id. We did not find that factual finding to be clearly erroneous, and instead reasoned that

> [n]o matter which of these versions is most accurate, Reed's arrest was effected not in a "public" place but in a place protected by the Fourth Amendment. She was not arrested in the hallway of the apartment building. Nor was she standing on the threshold of her apartment in such a way that she would have been inside the apartment by taking a step backward and "outside" by taking a step forward. . . . Rather, she was arrested inside of her home.

14

Id. at 422-23 (emphasis added). Regardless of the officer's position with respect

to the threshold at the time of the arrest, we concluded, Reed retained the

protections of her home. Indeed, we further noted that we did not believe that

> the fact that Reed opened the door to her apartment in response to the knock of three armed federal agents operated in such a way as to eradicate her Fourth Amendment privacy interest. To hold otherwise would be to present occupants with an unfair dilemma, to say the least[—]either open the door and thereby forfeit cherished privacy interests or refuse to open the door and thereby run the risk of creating the appearance of an "exigency" sufficient to justify a forcible entry. This would hardly seem fair in situations that present no exigent circumstances in the first place.

Id. at 423 n.9 (citation omitted).

Reed, a decision expressly approved by the Supreme Court in Payton,[8]

thus provides strong support for Allen's position. Under one of the factual

scenarios that we accepted as true for purposes of that case, Reed was arrested

while she stood inside her threshold and officers remained outside of it. We held

that if that is what occurred, such an "across the threshold" arrest was

unconstitutional.

_____

[8] In its opinion in Payton, the Supreme Court cited Reed with approval, noting that the decision was "persuasive and in accord with this Court's Fourth Amendment decisions." 445 U.S. at 589.

The government argues, however, that <u>Reed</u> and <u>Payton</u> must be read in light of our more recent decisions in <u>United States v. Gori</u>, 230 F.3d 44 (2d Cir. 2000), and <u>United States v. Titemore</u>, 437 F.3d 251 (2d Cir. 2006).  In <u>Gori</u>, police officers who were surveilling the door of a known "stash house" from the hallway of the apartment building, were surprised by the arrival of a woman delivering an order of food to the surveilled apartment.  230 F.3d at 46.  The officers, who had no warrant, permitted the woman to carry out her delivery, and after an occupant of the apartment opened the door in response to her knock, the officers, with their weapons drawn and badges displayed, ordered all six of the occupants to step outside for the purposes of a brief investigatory detention. <u>Id.</u> at 47.  Eventually, two of the occupants were placed under arrest.  <u>Id.</u> at 48.

Those two occupants later sought to suppress physical evidence seized from the apartment and the statements they made, contending that police had entered the apartment without consent and in the absence of exigent circumstances.  <u>Id.</u>  The district court granted the suppression motion.  While crediting the officers' testimony that they did not physically cross the apartment's threshold, the district court nevertheless determined that the officers' conduct constituted an entry into the apartment sufficient to trigger <u>Payton</u>.  <u>Id.</u>

16

at 48-49. A divided panel of this Court reversed, concluding that <u>Payton</u> was not implicated. Because the occupants opened the apartment "in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall." <u>Id.</u> at 53, citing <u>Santana v. United States</u>, 427 U.S. 38 (1976).[9] Thus, the officers "needed no warrant to temporarily 'seize' the occupants and conduct a limited investigation," <u>id.</u>, more commonly known as a <u>Terry</u> stop. This Court reasoned that "<u>Terry</u> must encompass" situations in which "police standing in the hallway come face to face with the suspects through a door opened voluntarily by the suspects in response to a knock by an invitee." <u>Id.</u> at 56.

---

[9] In <u>Santana</u>, police sought to arrest Santana following an undercover narcotics purchase at her residence. As the police drove up to the house, "[t]hey saw Santana standing in the doorway of the house with a brown paper bag in her hand." 427 U.S. at 40 (1976) (footnote omitted). As the officers approached within 15 feet of where Santana was standing and got out of their van shouting police, Santana retreated into the house. Police officers chased her through the open door, causing packets of heroin to spill out of the paper bag that she had been holding, and arrested her in the vestibule of her home. <u>Id.</u> at 40-41. The exigent circumstance of "hot pursuit" excused the warrant requirement. <u>Id.</u> at 42-43. <u>See</u> <u>also</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984) (describing <u>Santana</u> as a case involving "hot pursuit of a fleeing felon"). <u>Santana</u> does not govern this case because the government has never contended that exigent circumstances existed here.

17

By relying on <u>Santana</u> and the principles articulated in <u>Terry</u>, the panel majority was able to avoid the question of whether "<u>Payton</u>'s solicitude is aroused when a dwelling is penetrated by the voice of a police officer standing outside." <u>Id.</u> at 51. Further, the panel noted that "[b]ecause the defendants opened the door in response to a knock initiated by someone whom they invited," it did not "need [to] not consider whether a suspect loses the heightened protection of <u>Payton</u> merely by opening a door in response to a knock by law enforcement." <u>Id.</u> at 52 n.4. Given those constraints, the majority concluded that "[o]nce a door is voluntarily opened by an occupant in response to a knock by someone invited by the occupant, the Fourth Amendment's protection of the home is not abrogated so long as the officer's conduct was reasonable under the circumstances." <u>Id.</u> at 54.

Then-Judge Sotomayor dissented, concluding that <u>Terry</u> stops were not permissible in the home. <u>Id.</u> at 62-63 (Sotomayor, *J.*, dissenting). Unlike the majority, she further concluded that <u>Payton</u> was applicable "because the occupants . . . were *within the boundaries* of the apartment and had a reasonable expectation of privacy against government entry into the home." <u>Id.</u> at 61 (emphasis added). <u>Payton</u>, in her view, was violated because "[w]ith their show

18

of authority from outside the door," the officers made a "warrantless constructive entry into the home," and thereby "achieved the same result . . . they would have achieved had they crossed into the apartment and removed the occupants." Id. at 62. Were police able to circumvent Payton by forcing occupants outside, "Payton's warrant and probable cause requirements would be meaningless." Id. at 62.

In Titemore, a police officer wishing to speak with a suspect in his home walked across the front lawn, up three steps to a porch, and approached a sliding-glass door. 437 F.3d at 254, 259. The glass door was open, but the screen was closed. Standing outside the screen door, the officer spoke to Titemore, who was sitting in the room with a firearm nearby. Id. The district court denied Titemore's motion to suppress the eventual seizure of the gun as the fruit of an unlawful entry onto his property, holding that an officer does not offend the Fourth Amendment when he approaches any part of a building where uninvited visitors could be expected. United States v. Titemore, 335 F. Supp. 2d 502, 506 (D. Vt. 2004).

We affirmed the district court with "little difficulty," because "when a police officer enters private property for a legitimate law enforcement purpose

19

and embarks only upon places visitors could be expected to go, observations made from such vantage points are not covered by the Fourth Amendment." 437 F.3d at 260 (internal quotation marks omitted). A police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." Kentucky v. King, 563 U.S. 452, 469 (2011). When the officer approached Titemore's door, there was not yet probable cause to arrest him; the officer intended only to ask him questions about an act of vandalism that was under investigation. Titemore was not placed under arrest during the ensuing interaction, and the officer's entry into the house and seizure of a rifle were based on Titemore's consent. 437 F.3d at 259-60.[8]

Nothing in Gori or Titemore undermines our holding in Reed, or suggests that officers may go to a person's home, call him or her to the door, and then arrest him while he remains in his home. Gori depends on the fact that the officers' surveillance was interrupted by the arrival of the delivery person, which led the officers to observe the suspects through a door that had been opened

---

[8] To the extent that Titemore may be read broadly to permit law enforcement officers to enter curtilage to search for evidence, that broad holding has been abrogated by Jardines, 133 S. Ct. at 1416 (holding that "background social norms that invite a visitor to the front door do not invite him there to conduct a search").

independent of any action or request by the police.  The closeness of the case is reflected in Judge Sotomayor's dissent even on those facts.  Titemore concerns the authority of the police to approach the door of a residence to ask questions, and does not address the legality of a warrantless, non-exigent arrest of a person inside his home by officers standing outside.

We believe that a careful reading of Reed establishes a precedent, binding on this panel, that when officers approach the door of a residence, announce their presence, and place the occupant under arrest when he or she, remaining inside the premises, opens the door in response to the police request, the arrest occurs inside the home, and therefore requires a warrant.  We follow that precedent because we must.  But we are also content to do so because we believe that the decision was correct.

In recent years, the Supreme Court has repeatedly made clear that the Fourth Amendment applies with its greatest force in the home.  See, e.g., Jardines, 133 S. Ct. at 1414 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); Georgia v. Randolph, 547 U.S. 103, 115 (2006) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people.").  While the "ultimate touchstone of the Fourth

21

Amendment is 'reasonableness,'" Riley v. California, 134 S. Ct. 2473, 2482 (2014), it remains true that "searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). Although law enforcement officers, like any other citizens, have an implied license to approach a home, knock on the door, and try to speak with the occupants, King, 563 U.S. at 469; see also Titemore, 437 F.3d at 259-60, "[t]he scope of [that] license – express or implied – is limited not only to a particular area but also to a specific purpose." Jardines, 133 S. Ct. at 1416. Such a purpose generally does not include conducting a warrantless search, id., or likewise, a warrantless arrest.

Bearing in mind that the government bears a "heavy burden" when attempting to justify warrantless arrests in the home, see Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984), in light of our precedent and recent Supreme Court case law, we conclude that Allen's "across the threshold" arrest violated the Fourth Amendment. If the rule of Payton, and the fundamental Fourth Amendment protection of the home on which it is based, are to retain their vitality, the rule must turn on the location of the defendant, not the officers, at the time of the arrest. We therefore hold that irrespective of the location or conduct of the

22

arresting officers, law enforcement may not cause a suspect to open the door of the home to effect a warrantless arrest of a suspect in his home in the absence of exigent circumstances.

While it is true that physical intrusion is the "chief evil" the Fourth Amendment is designed to protect against, Payton, 445 U.S. at 585, we reject the government's contention that this fact requires that Payton's warrant requirement be limited to cases in which the arresting officers themselves cross the threshold of the home before effecting an arrest. The protections of the home extend beyond instances of actual trespass. As then-Judge Sotomayor observed, "Payton's warrant and probable cause requirements would be meaningless," Gori, 230 F.3d at 62 (Sotomayor, J., dissenting), if officers could effect warrantless in-home arrests through shows of authority.

As a practical matter, allowing the police to arrest a subject in his home, even without first entering the home, would undermine the barrier against government intrusions into the home that the warrant requirement attempts to erect. In cases like this one, the arrest takes place *in the home*, and as this case illustrates, a physical intrusion into the home will very frequently follow the arrest.

There is no dispute in this case that Allen was *arrested* while still in his home. The government does not contend that Allen was free to refuse the officers' command that he would have to come to the police station with them, or that a "reasonable person" would have felt free to do so. See United States v. Mendenhall, 446 U.S. 544, 554 (1980). The government does not and could not contend that Allen made a consensual decision to accept a police invitation to discuss matters with them at another location. From the point at which the officers told Allen that he would need to come down to the police station to be processed for the assault, they had asserted control over his person. Allen reasonably believed that he needed the officers' permission to return upstairs to get his shoes and to say goodbye to his daughter, and the officers confirmed that belief, advising him that he could go upstairs *only if* he was accompanied by one or more officers. The result of the "across the threshold" arrest was exactly the same as if the officers had entered the apartment and arrested Allen inside, save that the intrusion into the apartment's interior followed rather than preceded the announcement that Allen was under arrest.

By advising Allen that he was under arrest, and taking control of his further movements, the officers asserted their power over him *inside his home*.

24

That they did so is evident if we consider what would have happened if Allen, after being told in effect that he was under arrest, had simply closed the door and retreated deeper into his home. It is inconceivable that the officers would at that point have shrugged their shoulders and turned away. An arrested person is, and should be, *arrested*: When the police are authorized to take a person into custody, and undertake to do so, they must have the authority to make the arrest effective if the suspect refuses to comply.

A rule that permitted an arrest "across the threshold," but allowed the arrested person to refuse the arrest simply by closing the door, would not be viable, for it would undermine the authority of the police and encourage resistance by those who were aware of the rule. The "right to remain literally at [an arrestee's] elbow," <u>Washington v. Chrisman</u>, 455 U.S. 1, 6 (1982), attaches immediately upon arrest. But if that is so, then an arrest "across the threshold" will often lead to the very intrusion into the home that <u>Payton</u> warns is the "chief evil" against which the warrant requirement protects. 445 U.S. at 585.

The government's effort to invoke the authority of <u>Hodari D.</u> to claim that Allen was only arrested when, and because, he submitted to the officers' demand rather than resisting it, is unpersuasive. Under <u>Hodari D.</u>, "[a]n arrest requires

either physical force . . . or, where that is absent, submission to the assertion of authority." 499 U.S. at 626 (emphasis omitted). We know of no authority that applies the rule of Hodari D., which was crafted to deal with police-citizen encounters on the street, to in-home encounters. On the street, the police may enforce their lawful commands by force, chasing down and overcoming a suspect who refuses to comply with an officer's announcement that the suspect is under arrest. If applied with due regard for the sanctity of the home, however, the Hodari D. approach would be unworkable in the context of an "across the threshold" arrest. If the rule of Payton is respected, an officer lacking a warrant would have to stop at the threshold and allow a suspect to defy arrest. Alternatively, if the "across the threshold" arrest is to be rendered effectual, the police would have to be authorized to pursue the suspect into his home, undermining the Payton rule. The government's argument injects an incoherent third layer between consensual police-citizen encounters and Fourth Amendment seizures – the quasi-voluntary arrest, in which a suspect does not freely agree to accompany the officers, but rather is under arrest, yet only to the extent that he agrees to be. The Hodari D. framework thus cannot properly be applied to police encounters with persons inside their homes.

Allen's behavior cannot be seen as waiving or forfeiting the protections of the Fourth Amendment. While Allen had no obligation to open the door or to speak to police officers in the first place, see King, 563 U.S. at 470, the fact that he – as would most reasonable people – chose to do so does not mean that he forfeited the Fourth Amendment's protections of the home. As in Reed, "to hold otherwise would present occupants with an unfair dilemma," 572 F.2d at 423 n.9, and would discourage citizens from opening the door to speak with law enforcement officers. The government does not contend that Allen consented to the officers' entry into his home. Neither is it argued – nor could it be, on these facts – that any exigency existed that would excuse the need for a warrant.

While the consequences of the rule advocated by the government are problematic, the consequences of the rule gleaned from Reed do not present comparable difficulties. Certainly there is no difficulty on the facts of this case. Here, the officers had probable cause to arrest Allen two days before the arrest, ample time to obtain a warrant. Any problems in effecting the arrest were thus the result of their decision to forgo seeking a warrant, and instead go to Allen's home with the "pre-formed plan . . . to arrest [him]" without a warrant. J.A. 137.

Nor would application of the <u>Reed</u> rule create problems in cases in which probable cause is initially lacking, but develops during the course of a "knock and talk" visit to the suspect's home. If the circumstances create an exigency (say, the police interview yields the information that the suspect has a bomb inside his apartment), the exigent circumstances exception to the warrant requirement will permit the officers to cross the threshold and make the arrest. Absent such exigency, the availability of telephonic warrants, the ability of officers to surveil the home until a warrant is obtained, and the power to make a warrantless arrest if the suspect emerges from his home into the street, <u>see</u> <u>United States v. Watson</u>, 423 U.S. 411, 413, 417-18 (1976), should permit effective arrests in virtually all cases.

Finally, unlike our sister circuits, we do not believe that the legal fiction of "constructive" or "coercive" entry is necessary to reach this result, nor that it provides adequate guidance to law enforcement officers or to the judiciary who must review these liminal cases. Under that doctrine, an "across the threshold" arrest counts as an entry into the home by the police if their command to the occupant to submit to arrest is sufficiently forceful and compelling, but not if, as in this case, the occupant calmly responds to an authoritative, but polite,

command to accompany the officers and submit to police custody.  Such a rule is beset with practical problems.  As the author of one leading treatise has recognized, the need to sort out whether an arrest occurred in, at, on, or by the threshold already presents close fact-finding issues for the district courts.  See 3 Wayne R. LaFave, 3 Search and Seizure: A Treatise on the Fourth Amendment § 6.1(e) (5th ed. 2012).  To add an additional layer of uncertainty to that burden by requiring courts to determine whether a non-exhaustive list of factors, such as the events immediately preceding or accompanying the order, the number and location of officers, the nature and content of the words used to transmit the command, and whether police guns are holstered or brandished, constitute circumstances sufficient to trigger Payton would multiply the difficulties of applying the rule.  See, e.g., Saari, 272 F.3d at 808.  Such a rule not only requires courts to "employ[] metaphysical subtleties to resolve Fourth Amendment challenges," Gori, 230 F.3d at 54 (internal quotation marks omitted), but also contravenes the "general preference to provide clear guidance to law enforcement through categorical rules," Riley, 134 S. Ct. at 2491.

Apart from these practical consequences, the "constructive entry" rule strikes us as conceptually muddled.  Turning the application of Payton on

29

whether the officers physically entered the home seems to us undesirable, but it at least presents a clear rule with a clear rationale, rooted in the special protection of the home against governmental intrusion. But if that is to be the primary rule, it is unclear what rationale supports an exception where the officers remain outside, but convey their command to the occupant with sufficient force to ensure that he will comply. More to the point, the reasons for applying the Payton rule in the "constructive entry" cases is equally applicable to the present case. Exerting the authority of the police to require a suspect to leave his home to be arrested is a sufficient "constructive" entry to require a warrant. The command of an officer, legally entitled to make an arrest by the existence of probable cause, is, and should be, a sufficient exercise of authority to require the suspect to comply with that command, whether or not the officer backs the command with a sufficiently loud and clear threat of force. Such a command projects the authority of the police into the home, and requires a warrant under Payton.[9]

---

[9] To the extent the government argues that adhering to the Reed rule regarding "across the threshold" arrests would require a warrant before the police could telephone or e-mail a suspect to demand his appearance, we are content to leave that issue for another day. It is doubtful whether such a practice, if it exists at all, could amount to a seizure, any more than the issuance of a summons or

In short, we embrace the rule, which in any event we are compelled to follow by the binding circuit precedent of <u>Reed</u>, that where law enforcement officers summon a suspect to the door of his home and place him under arrest while he remains within his home, in the absence of exigent circumstances, <u>Payton</u> is violated regardless of whether the officers physically cross the threshold. That rule applies regardless of whether the police "constructively" or "coercively" entered the apartment through shows of force or authority beyond that conveyed by the simple command to the occupant to submit to arrest. We believe that this rule provides clear guidance to law enforcement, avoids undue complexities and perverse incentives to householders not to open their doors to inquiring police officers, and most importantly, ensures that the Fourth Amendment protections, which are at their zenith in the home, are adequately protected.

---

subpoena does. In contrast, the present case involves the highly traditional arrest procedure of a face-to-face announcement by one or more officers that a suspect is under arrest and must immediately accompany the officers and submit to their direction.

## CONCLUSION

For the foregoing reasons, we VACATE appellant's conviction, REVERSE

the denial of the suppression motion, and REMAND the case for further

proceedings consistent with this opinion.

LOHIER, <u>Circuit Judge</u>, <u>concurring</u>:

I concur in the judgment. I am finally persuaded that our precedent in <u>United States v. Reed</u>, 572 F.2d 412, 422-23 (2d Cir. 1978), whether or not the case was correctly decided, compels the result the majority reaches. I write separately to emphasize that the conceded facts and issues in this case make it, in my view, quite unusual. For example, the Government concedes that no exigent circumstances arose at any time during the encounter between the police officers and Allen; that Allen was arrested specifically "in" his home rather than "on" the threshold or in a "public place," <u>see</u> <u>United States v. Santana</u>, 427 U.S. 38, 42 (1976); and that Allen never consented to entry into his home, <u>see</u> <u>Johnson v. United States</u>, 333 U.S. 10, 13 (1948). This is also not a case where the police officers advised Allen that he was not under arrest and that he was free to refuse to speak with them and close the door, or a case where they asked him to step outside his home to talk before arresting him. In the first case, in the absence of a valid warrant Allen could, in my view, legally refuse to speak to the police and even close the door without thereby creating a separate basis to arrest him. Wayne R. LaFave, 3 Search & Seizure § 6.1(e) (5th ed. 2012) (explaining that in most cases such a response, standing alone, would not create an exigent

1

circumstance, and "the police should be required to withdraw and return another time with a warrant").  In the second case, had Allen accepted the officers' invitation to step across the threshold to speak with them, nothing in Reed would prevent the officers from arresting him then and there.

I have two final observations.  First, I do not understand the majority's holding to have rejected what the majority describes as the "legal fiction," and what I regard as the legal reality, of coercive entry.  Second, I recognize that the language and the rationale of Payton focuses on the Government's entry into the home rather than the defendant's arrest there.  See Payton v. New York, 445 U.S. 573, 590 (1980) ("Absent exigent circumstances, th[e] threshold may not reasonably be crossed without a warrant.").  But Reed, which the Supreme Court cited favorably in Payton, requires that we focus on the place of arrest in the absence of physical entry.  It is for this reason that I concur.